## C. H. MEAD COAL CO. v. COMMISSIONER OF INTERNAL REVENUE.
### No. 3611.

Circuit Court of Appeals, Fourth Circuit.
June 20, 1934.

Frederick L. Thomas, of Charleston, W. Va. (Robert S. Spilman and Price, Smith & Spilman, all of Charleston, W. Va., on the brief), for petitioner.

J. P. Jackson, Sp. Asst. to Atty. Gen. (Frank J. Wideman, Asst. Atty. Gen., and Sewall Key, Sp. Asst. to Atty. Gen., on the brief), for respondent.

Before PARKER and SOPER, Circuit Judges, and PAUL, District Judge.

SOPER, Circuit Judge.

This petition for review involves deficiencies in federal income taxes for the years 1925 to 1928, inclusive, in the aggregate amount of $14,732.06. Two questions are presented: (1) Whether the taxpayer is entitled to take the sum of $335,000 as the cost of certain physical properties in calculating its depreciation deduction, and (2) whether the taxpayer is entitled to take as a deduction from its income in the year 1925 a loss of $82,438.26 on an exchange of stock held by it in the Interstate Coal & Dock Company of Maine for stock in Low Volatile Consolidated Company of Ohio, a newly organized corporation. If the exchange was made pursuant to a reorganization within the meaning of the Revenue Act of 1926, no loss on the exchange may be recognized.

The first question relates to a transfer of properties made to the C. H. Mead Coal Company, the taxpayer, a West Virginia corporation, having an authorized capital stock of $600,000, shortly after its organization in 1920. On January 17, 1920, at the first meeting of the taxpayer's board of directors, a proposal was received from C. H. and C. S. Mead to transfer to the corporation for a certain consideration certain coal properties in West Virginia. The Meads had obtained an option upon the property of the East Gulf Coal Company, Raleigh, W. Va., which included leaseholds of about 2,500 acres of valuable coal land and all the practically new mining equipment, improvements, and supplies used by it in an operation which had begun in 1916. The option contemplated the sale of the East Gulf Coal Company's plant, improvements, and machinery for $235,000 in cash, and the granting of a sublease on the land upon the following considerations: (1) The assumption of all royalty obligations carried in the original leases, and (2) the payment by the sublessee to the sublessor of an annual rental of $50,000 for the twelve years next ensuing. The option also included the transfer to the sublessee of the rights of the East Gulf Coal Company in the proceeds of a certain contract with the Virginia Railway Company and in certain rents, the last-mentioned contract and rents not being more particularly described in the evidence.

The Meads offered to sell the option to the taxpayer in return for 1,000 shares of the taxpayer's stock, of a par value of $100 each; and this offer was accepted by the taxpayer. The 1,000 shares were issued to the Meads for their option and the purchase price of $235,000 for the physical assets was paid over by the taxpayer to the East Gulf Coal Company. The taxpayer, in setting up the transaction on its books of account, added $100,000 to the cost of the physical assets, so that they appeared on the books at the cost of $335,000. The Commissioner refused to allow the sum of $335,000 as representing the

cost of the physical property, and determined the proper cost to be $235,000.

The basis for the determination of depreciation on physical property under section 204 (a) and (c) of the Revenue Act of 1926, 44 Stat. 9 (26 USCA § 935 (a), (c), is the cost to the taxpayer of the depreciable property. There is no question here as to the proper allocation of the sum of $100,000 amongst the several items making up the physical property, or as to the value of the physical property, or as to the value of the $100,000 par value of stock issued to the Meads, for it was stipulated by the parties that if the Board of Tax Appeals should be of the opinion that the $100,000 should be restored to petitioner's statement of cost of physical assets, then the changes made by the Commissioner should be reversed and petitioner's property should be depreciated on the basis of the book value originally set up. The Board found as facts that the physical assets acquired by the taxpayer were, at the date of acquisition, worth at least $335,000, and also that the $100,000 par value of stock issued to the Meads was at the time of issuance worth $100,000 in cash. The Board nevertheless approved the determination of the Commissioner that the deduction for depreciation on the physical property should be calculated on a cost basis of $235,000 and not on a cost basis of $335,000, as set up on the taxpayer's books. The reason assigned in the Board's decision was that the $100,000 capital stock paid for the option did not represent the additional cost to the petitioner of the physical property alone, but represented the cost to the taxpayer of all of the properties acquired from the East Gulf Coal Company, covered by the option and the sublease. The Board said: "No evidence was introduced to show how the $100,000 should be apportioned between the physical properties, the sublease and the rights under the contract with the Virginia Railway Company and to certain rents. The fact that the physical properties were worth at least $335,000 at the time they were acquired by the petitioner does not furnish any basis for allocating the total amount paid for the option to such properties. The lands which were leased were very valuable coal lands, and the acquisition of a lease of such lands might well have been worth $100,000 to petitioner without the acquisition of the mining equipment already on the lands. There is absolutely no evidence from which we could find what, if any, portion of the $100,000 should be allocated to the physical property. In the absence of such evidence the determination of the re-

spondent as to the basis for depreciation must be sustained."

Under the established rule, the burden of proof was upon the taxpayer to establish the cost of the property, and the Board was not bound to accept the opinion testimony of interested witnesses. Burnet v. Houston, 283 U. S. 223, 51 S. Ct. 413, 75 L. Ed. 991; Anchor v. Commissioner (C. C. A.) 42 F. (2d) 99; Bourne v. Commissioner (C. C. A.) 62 F. (2d) 648. Furthermore, the proper allocation of the cash sum of $100,000 paid with other considerations for the option was necessarily a matter of opinion, since the contract between the Meads and the taxpayer was silent on the subject. It is nevertheless our view that the finding of the Board on the point under discussion was not justified by the evidence. The Board gave as one reason for rejecting the taxpayer's contention, that the leased lands were very valuable and the acquisition of the lease might well have been worth $100,000. This possibility of course existed, but the value of the lease was expressly recognized in the contract in the provision for the payment by the sublessee to the original lessee of the annual rental of $50,000 for the twelve years next ensuing. Ignoring this consideration, and also the admitted fact that the physical equipment was actually worth $335,000, the Commissioner determined that the cost of the physical equipment was only $235,000. The effect of this conclusion was necessarily to attribute to the cost of the other properties the entire additional payment of $100,000; and there is no evidence in the case which indicates that they were worth this sum in addition to the royalties covered by the original lease and the additional annual payments of $50,000 to be made to the original lessee.

Moreover, it does not appear from an examination of the record to be correct to say, as the Board did, that "there is absolutely no evidence from which we could find what, if any, portion of the $100,000 should be allocated to the physical property." This conclusion can only be reached by ignoring certain testimony given on behalf of the taxpayer at the hearing before the Board by J. P. Nowlin, secretary and treasurer of the taxpayer corporation since 1920, and by C. H. Mead. Both of these witnesses were experienced coal men, familiar with mining equipment, and particularly with the physical property acquired from the East Gulf Coal Company. Their evidence showed that they made an analysis of the properties acquired and allocated the sum of $100,000 to sundry items of the physical properties in or-

der to establish the cost to be entered upon the corporation's books. It is suggested that this testimony amounts only to an opinion as to how the sum of $100,000 should be divided amongst the several items of physical property; but it is quite clear that no part of this amount could be allocated thereto unless the conclusion had been reached that the amount so set up should be attributed to the physical rather than to the other properties covered by the option. This is not a case, therefore, in which the Board, in the exercise of its authority to make findings of fact, has considered the testimony of expert witnesses and rejected it as incredible. On the contrary, the Board has failed to consider testimony which, in view of the admitted facts, was entitled to great weight. Since the physical property was actually worth $100,000 more than the amount named in the option, and the holders of the option were given stock worth $100,000 as part of the consideration for the transfer of their rights, we think that the uncontradicted testimony of experienced men that the additional consideration should be allocated to the physical property was well nigh controlling. The decision of the Board of Tax Appeals on the first question must therefore be reversed.

The second question relates to a transaction resulting in the acquisition by the taxpayer in 1925 of 947 shares of no par common stock of the Low Volatile Consolidated Coal Company of Ohio, worth about $40 per share, or $37,880 in all, in place of 2,083 shares of common stock of the Interstate Coal & Dock Company, a Maine corporation, for which it had paid $120,318.26. The taxpayer claimed the right to deduct the difference between these amounts or $82,438.26, from its income in 1925; but the Commissioner of Internal Revenue disallowed the deduction and the Board of Tax Appeals approved his determination, holding that the transaction constituted a "reorganization" within the meaning of section 203 (h) (1) (A), and section 203 (b) (2) of the Revenue Act of 1926, 26 USCA § 934 (h) (1) (A) and (b) (2).

The Interstate Coal & Dock Company, hereinafter called the Maine Company, controlled and operated from 1921 to 1925 the Low Volatile Consolidated Coal Company, a West Virginia corporation, hereinafter called the West Virginia Company, all of whose stock was common stock. The Maine Company owned 9,600 shares of stock of the West Virginia Company, out of a total of 13,516 shares outstanding. On October 10, 1922, the assets of the Maine Company were mortgaged under a deed of trust with the Union Savings Bank & Trust Company as collateral security for a loan of approximately $500,000. The mortgage was subsequently transferred to the Union Trust Company of Cincinnati, Ohio. The Union Trust Company having threatened to foreclose the mortgage, a meeting of certain stockholders of the Maine and West Virginia Companies was held on April 15, 1925, for the purpose of devising ways and means of acquiring the properties of these two companies at the foreclosure sale. Such a plan was devised and the stockholders notified thereof under date of May 9, 1925, in a letter setting forth the plan for refinancing the companies. The letter stated that at the meeting there were present more than 60 per cent. of the preferred stock of the Maine Company and more than 80 per cent. of the outstanding stock of the West Virginia Company, and it was unanimously voted, after full discussion, that the only practical method of refinancing these companies was through reorganization. The letter also contained the further statement:

"In accordance with the resolutions adopted at that meeting a new corporation has been formed under the laws of Ohio known as Low Volatile Coal Company, for the purpose of acquiring at foreclosure or other sale, the property of the Interstate and Low Volatile Consolidated Companies and protecting the parties in interest. The capital stock of the new Low Volatile Coal Company will consist of 10,000 shares of $100.00 par value each, or $1,000,000.00, of 7% cumulative preferred stock, and 20,000 shares of common stock without nominal or par value. All shares, both common and preferred, will have equal voting rights. * * *

"It was determined at the Cincinnati meeting to offer for subscription the preferred stock of the new company at par to the stockholders of the Interstate Coal & Dock Company, their allotment of 7,800 shares being based on their proportion of the net obligations of the two companies; and to the minority stockholders of the Low Volatile Consolidated Coal Company (being all the stockholders of said company other than Interstate Coal and Dock Company) their allotment of 2,200 shares being based on their pro rata proportion of the net obligations of the Low Volatile Consolidated Coal Company.

"Arrangements have now been made with the officers of the new company, so that we are able to offer this preferred stock for subscription at par. * * *

"Subscribers for preferred stock will receive with each share of preferred stock one share of the common stock without further payment. Until said subscriptions are fully paid certificates will be issued to the subscribers showing thereon the amount paid and the amount yet to be paid upon call.

"Proper steps will be taken so as to permit the distribution of the remaining 10,000 shares of common stock to the holders of preferred stock of the Interstate Coal and Dock Company and to the minority holders of the Low Volatile Consolidated Coal Company upon the basis of 45% of a share of such new common stock for each share of Interstate Coal & Dock Company preferred and 45% of a share of such new common stock for each share of Low Volatile Consolidated Coal Company stock so held, whether they subscribe for the preferred stock of the new company or not. * * *"

On June 30, 1925, the Union Trust Company foreclosed the mortgage and all of the assets of the Maine Company were sold to the newly formed Ohio Company for $491,000. The taxpayer did not exercise its option to purchase the preferred stock of the Ohio Company at par, and to receive therewith common stock as a bonus. It did, however, receive 947 shares of the common stock of the Ohio Company on account of its ownership of 2,083 shares of the preferred stock of the Maine Company.

After the transaction had taken place, less than 80 per cent. of the stockholders of the Maine and West Virginia Companies became holders of less than 68 per cent. of the common and preferred stock of the Ohio Company. Of this 68 per cent., about one half was acquired through the distribution of the 10,000 shares of the common stock of the Ohio Company to the preferred stockholders of the Maine Company and the minority stockholders of the West Virginia Company; the other half consisting equally of preferred stock subscribed by the old stockholders and common stock issued as a bonus for each share.

The result to the taxpayer was that whereas it had previously held about 10 per cent. of the preferred stock of the Maine Company, it thereafter held about 5 per cent. of the common stock of the Ohio Company. The Maine Company stock became valueless since all of its property had been disposed of. There is no question that there was a deductible loss of $82,438.26 as the result of the transaction if it did not amount to a reorganization under the terms of the statutes.

The statutes applicable to this phase of the case are section 203 (b) (2) and section 203 (h, i) of the Revenue Act of 1926, 26 USCA § 934 (b) (2) and (h, i). These sections are as follows:

"Sec. 203. * * * (b) * * * (2) No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization."

"Sec. 203. * * * (h) As used in this section and sections 201 and 204 [sections 932 and 935]—

"(1) The term 'reorganization' means (A) a merger or consolidation (including the acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation, or substantially all the properties of another corporation), or (B) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its stockholders or both are in control of the corporation to which the assets are transferred, or (C) a recapitalization, or (D) a mere change in identity, form, or place of organization, however effected.

"(2) The term 'a party to a reorganization' includes a corporation resulting from a reorganization and includes both corporations in the case of an acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation.

"(i) As used in this section the term 'control' means the ownership of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of the corporation."

Taking into consideration that only about 68 per cent. of the new company's stock was owned after the transaction by stockholders of the two old companies, and that only about 80 per cent. of the stockholders of the old companies owned stock in the new company, and considering also that the term "control" under the statute means the ownership of at least 80 per cent. of the voting stock, the Board conceded, for purposes of argument, the correctness of the taxpayer's contention that the transaction was not a reorganization within the meaning of section 203 (h) (1) (B) of the act (26 USCA § 934 (h) (1) (B). It was held, however, that the transaction fell

within the definition of a merger or consolidation under section 203 (h) (1) (A). We think the Board was correct in this conclusion.

The taxpayer's contention in this court is founded upon the view that the case involves no more than a transfer by a corporation of all of its property to another corporation, within the meaning of clause (B) of section 203 (h) (1), and that since neither the old companies nor their stockholders retained control of the new corporation, there was no reorganization within the meaning of the section. It is urged in support of this view that the parenthetical words of clause (A), "including the acquisition by one corporation of * * * substantially all the properties of another corporation," may not be read so broadly in respect to the acquisition of property for stock as to nullify clause (B) dealing with the transfer of property for stock. And it is said that we are here concerned with a transfer of property within clause (B) rather than an acquisition of property in a transaction partaking of the nature of a merger or consolidation, because the property was sold under foreclosure at the insistence of the mortgagee, and not by voluntary act of the stockholders, even though the plan for refinancing the enterprise emanated from them.

In so far as this argument suggests that clause (B) of section 203 (h) (1) modifies or restricts the application of clause (A), we think it has been definitely repudiated by the Supreme Court. In Pinellas Ice & Cold Storage Co. v. Commissioner, 57 F.(2d) 188, 190, the Circuit Court of Appeals adopted a similar interpretation, saying: "It must be assumed that in adopting paragraph (h) Congress intended to use the words 'merger' and 'consolidation' in their ordinary and accepted meanings. Giving the matter in parenthesis the most liberal construction, it is only when there is an acquisition of substantially all the property of another corporation in connection with a merger or consolidation that a reorganization takes place. Clause (B) of the paragraph removes any doubt as to the intention of Congress on this point."

The Supreme Court, though approving the conclusion of the court that a transfer of property in exchange for cash and short term promissory notes was not a reorganization, said of this language (287 U. S. 462, at page 469, 53 S. Ct. 257, 260, 77 L. Ed. 428):

"But the construction which the court seems to have placed upon clause A, paragraph (h) (1), section 203, * * * we think is too narrow. It conflicts with established practice of the tax officers and, if passed without comment may produce perplexity. * * *

"The paragraph in question directs (quoting clause (A) * * * The words within the parenthesis may not be disregarded. They expand the meaning of 'merger' or 'consolidation' so as to include some things which partake of the nature of a merger or consolidation but are beyond the ordinary and commonly accepted meaning of those words— so as to embrace circumstances difficult to delimit but which in strictness cannot be designated as either merger or consolidation."

■ We think, moreover, that the legislative history of the reorganization provisions clearly demonstrates that the terms "merger" and "consolidation" are to be given a liberal interpretation to effectuate the purposes with which they were enacted. Prior to the Revenue Act of 1918 (40 Stat. 1057), the federal income tax laws did not contain any provisions especially relating to the reorganization, merger, or consolidation of corporations. There had been a number of decisions in which the Supreme Court considered the question whether a gain or a loss resulted in the reorganization of a corporation wherein an exchange of stock took place; and the difficult question was discussed as to whether the reorganized corporation represented substantially the same interests as the stockholders had enjoyed prior to the reorganization. See Weiss v. Stearn, 265 U. S. 242, 44 S. Ct. 490, 68 L. Ed. 1001, 33 A. L. R. 520; Marr v. United States, 268 U. S. 536, 45 S. Ct. 575, 69 L. Ed. 1079; United States v. Phellis, 257 U. S. 156, 42 S. Ct. 63, 66 L. Ed. 180; Rockefeller v. United States, 257 U. S. 176, 42 S. Ct. 68, 66 L. Ed. 186; Cullinan v. Walker, 262 U. S. 134, 43 S. Ct. 495, 67 L. Ed. 906. The decision in most of these cases turned on the form rather than the substance of the transaction and the taxpayer was sometimes charged with a gain on a purely paper profit, which was not actually realized. In this situation, Congress took the matter in hand and included certain provisions in the Revenue Act of 1918, which have been enlarged in the subsequent Acts of 1921 (42 Stat. 227) and 1924 (43 Stat. 253), and have been continued in all subsequent acts. It appears from the reports of the congressional committees that the underlying purpose of these provisions was twofold: (1) To relieve certain types of corporate reor-

ganization from taxation which seemed to be oppressive and premature, and (2) to prevent taxpayers from taking losses on account of wash sales and other fictitious exchanges. (See S. Rep. No. 617, 65th Cong., 3d Sess., pp. 5 and 6, in regard to the Revenue Act of 1918; S. Rep. No. 275, 67th Cong., 1st Sess., pp. 11 and 12, and H. Rep. No. 350, 67th Cong., 1st Sess., page 10, in regard to the Act of 1921; H. Rep. No. 179, 68th Cong., 1st Sess., page 13, and S. Rep. 398, 68th Cong., 1st Sess., pages 14 and 15, in regard to the Act of 1924. See also H. R. 8245, 67th Cong., 1st Sess., pp. 12 and 13, in regard to 1921 House Bill and House Conference Rep. on certain changes in that Act in H. Rep. 486, 67th Congress, 1st Sess., pp. 17 and 18; H. Rep. No. 179, 68th Cong., 1st Sess., p. 16, in regard to the 1924 Act, and S. Rep. No. 398, 68th Congress, 1st Sess., p. 17, in regard to same.)

The 1918 Act, section 202 (b), contained the first provision in this respect. It provided that no gain or loss should be deemed to occur when in connection with the reorganization a stockholder received in place of the stock owned by him new stock of no greater par value. The Senate's report shows that the provision was inserted to prevent the assertion of a tax in case of purely paper gains in transactions. The provision was, however, impracticable and the matter was again considered in the 1921 Act, § 202 (c) (2), which provided that no gain or loss should be recognized when in the course of a reorganization a person received in place of stock owned by him, stock in a corporation resulting from the transaction. It was provided that the merger or consolidation should include the acquisition by one corporation of a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation, or of substantially all the properties of another corporation. The Senate report stated that perhaps no part of the Income Tax Law had been productive of so much uncertainty or had more seriously interfered with necessary business readjustments, that the proposed section modified the presumption of taxability by providing that in case of exchange of property there should be no gain or loss unless there was a readily realizable market value in the property received, and also provided certain classes of exchanges in which there should be no gain or loss recognized, including in the latter a reorganization where stock or securities of one corporation were exchanged for stock or securities of the other.

The 1924 Act extended the reorganization provisions by providing in section 203 (c), 26 USCA § 934 note, that no gain should be recognized if there was distributed to a shareholder in a corporation, a party to the reorganization, stock or securities in such corporation without the surrender of the original stock or securities. There was also the provision that there should be no gain or loss if there was a transfer by a corporation of all or part of its assets to another corporation if immediately afterwards the transferor had 80 per cent. of the voting stock of the transferee. See section 203 (h) (1) (B) and section 203 (i), 26 USCA § 934 note. The reorganization provisions of the 1924 Act have remained fundamentally the same in subsequent acts. The report of the House Committee thereon pointed out that in the law previously existing there had been no provision that no gain or loss should be recognized if a corporation exchanges property for stock or securities in another corporation; that Congress had previously adopted the policy of exempting from tax the gain from exchanges made in connection with a reorganization so as not to prevent ordinary business transactions; and that it was necessary not only to exempt from tax the gain realized by the stockholders, but also to exempt from tax the gain realized by the corporation.

It will thus be seen that the general purpose of all of these reorganization provisions was the same, not merely to remove the impediment to corporate readjustments, but also to prevent the recognition of purely fictitious gains or losses in the administration of the income tax law. The original act contained no definition of the terms "reorganization," "merger," or "consolidation." The definition of "reorganization" in the Act of 1921 was the result of changes made in the bill as proposed by the House, which changes were proposed in the Committee of the Senate. Clause (B) in the 1924 Act was new, and it was stated in the Committee of the House that the purpose was to include within the terms of the definition of "reorganization" the case of a transfer by a corporation of all or part of its assets to another corporation if, after the transfer, the transferor or its stockholders should be in control. Compare Minnesota Tea Co. v. Commissioner, 28 B. T. A. 591. The purpose of the changes, that were made from time to time, seems to have been to cover situations where there was a transfer of substantially all the assets of one corporation to another, even though there was no resulting control by the old stockholders in the new corporation, and the course of the legislation indi-

cates that the various additions and amendments were intended to enlarge, rather than restrict, the scope of the section as a whole.

With this legislative history in mind, we reach the conclusion that the provisions of clause (A) of the section are to be given their normal meaning and are not restricted by the subsequent provisions of clause (B) so as to make it necessary that in the case of a merger or consolidation, in which there is an acquisition by one corporation of substantially all the properties of another corporation, there must also be a control in the new corporation by the old corporation, or its stockholders, to the extent of the ownership of 80 per cent. of the voting stock. If there is not merely a sale of the assets, but a continuity of interest on the part of the old stockholder in the new business, so that the old stockholder does not actually liquidate his holdings, but continues to be a participant in the enterprise without actual realization of profit, and if the transaction partakes of the nature of a merger or consolidation in a liberal view, it is not the purpose of the act to recognize either a gain or a loss in the transaction, and no such gain or loss will affect the income tax of the stockholder until the new stock or securities are disposed of.

Applying these rules to the facts in the pending case, we find there is something more than a bare foreclosure sale of corporate assets for cash as the taxpayer contends. There was a prearranged plan of refinancing the business, in the course of which the Ohio Company not only paid $491,000 in cash for the West Virginia Company's assets, but issued to its minority stockholders and the preferred stockholders of its parent corporation 10,000 shares of its common stock. The proceeds of the sale were used to take care of the old company's liabilities, and the new company took the property free from the lien of the mortgage, so that in effect preferred stock was substituted for an incumbrance upon the property. It is true that the transaction was effectuated through the foreclosure of the bank's mortgage, but such procedure is neither unusual in corporate refinancing, nor necessarily inconsistent with the idea of merger or consolidation in the liberal sense in which those terms must be construed. The foreclosure was acquiesced in by the corporation and its stockholders, who bought in the property in pursuance of a prearranged plan which entitled them to a substantial share of the new corporation's stock without any further investment. We think it may fairly be said that the sale was not altogether involuntary and that in large measure the parties allowed the proceeding to be carried through to its conclusion for reasons of their own convenience. See De Blois v. Commissioner (C. C. A.) 36 F.(2d) 11, 12. In substance, there was a conveyance of the property of the old corporation to a new company with fresh capital, for cash, sufficient to free the property from incumbrances, and for stock to be distributed among stockholders of the old company. The West Virginia Company was left without assets, and although perhaps not technically dissolved, it became merged into the Ohio Company within the meaning of the statute. The participation of its holding company, the Maine Company, gives the transaction certain aspects of a consolidation as well, but it is unimportant for our present purposes to determine whether the reorganization more closely resembled a merger or a consolidation.

It should not be necessary to add that the issuance to the old stockholders of stock in the new company provided the essential element, as the term "reorganization" has been defined, of a continuity of interest from the old corporation to the new. This circumstance serves to distinguish the case at bar from the cases of Pinellas Ice Co. v. Commissioner, supra; Cortland Specialty Co. v. Commissioner (C. C. A.) 60 F.(2d) 937; and Sarther Grocery Co., Inc., v. Commissioner (C. C. A.) 63 F.(2d) 68, 69, upon which the taxpayer relied.

The decision of the Board of Tax Appeals is reversed as to the first, and affirmed as to the second, question here involved, and the case is remanded for further proceedings in accordance with this opinion.

Reversed in part, affirmed in part, and remanded.