**B. F. STURTEVANT CO. et al. v. COMMISSIONER OF INTERNAL REVENUE.**
No. 2888.

Circuit Court of Appeals, First Circuit.
Jan. 16, 1935.

The questions involved on this petition are as follows:

1. Whether petitioner's invested capital may include good will which was not paid in for stock.

2. Whether under the evidence the Board was justified in finding that the patents and patent license owned by petitioner on March 1, 1913, had no fair market value in excess of cost, and that consequently petitioner was not entitled to use as a basis for exhaustion any greater amount than the cost of such patents and license.

3. Whether petitioner is entitled to a deduction for amortization of war facilities.

Philip Nichols, of Boston, Mass., for petitioners for review.

J. Louis Monarch, Sp. Asst. to Atty. Gen. (Frank J. Wideman, Asst. Atty. Gen., and Sewall Key, Sp. Asst. to Atty. Gen., on the brief), for Commissioner of Internal Revenue.

Before BINGHAM, WILSON, and MORTON, Circuit Judges.

MORTON, Circuit Judge.

This is a petition by the taxpayer to review an adverse decision by the Board of Tax Appeals. The case involves income and profits taxes for ten fiscal years. The intricate facts are outlined in the findings of the Board, 26 B. T. A. 598. We shall refer only to such as are pertinent to the matters before us.

The first question is whether the value of good will ought to have been included by the Commissioner in the petitioner's invested capital. The petitioner was organized under the laws of Massachusetts in 1890 to take over a business which had theretofore been carried on for many years by B. F. Sturtevant personally. Mr. Sturtevant by his will directed that his business should be transferred to a corporation; and this was done by his executors and trustees, the petitioner corporation being formed for that purpose. The laws of Massachusetts at that time did not permit capital stock to be issued for good will, trade-names, or even patents. Those assets of the Sturtevant business had very substantial value. As they could not be capitalized, they were turned over to the new corporation by the trustees under his will without any payment therefor.

BINGHAM, Circuit Judge, dissenting in part.

The pertinent provisions of the statutes in question (40 Stat. 1057, 1091) are as follows:

"Sec. 325. (a) That as used in this title—

"The term 'intangible property' means patents, copyrights, secret processes and formulæ, good will, trade-marks, trade-brands, franchises, and other like property;

"The term 'tangible property' means stocks, bonds, notes, and other evidences of indebtedness, bills and accounts receivable, leaseholds, and other property other than intangible property. * * *

"Sec. 326. (a) That as used 'in this title the term 'invested capital' for any year means * * *

"(1) Actual cash bona fide paid in for stock or shares;

"(2) Actual cash value of tangible property, other than cash, bona fide paid in for stock or shares, at the time of such payment, but in no case to exceed the par value of the original stock or shares specifically issued therefor, unless the actual cash value of such tangible property at the time paid in is shown to the satisfaction of the Commissioner to have been clearly and substantially in excess of such par value, in which case such excess shall be treated as paid-in surplus; * * *

"(3) Paid-in or earned surplus and undivided profits; * * *

"(4) Intangible property bona fide paid in for stock or shares prior to March 3, 1917, in an amount not exceeding (a) the actual cash value of such property° at the time paid in, (b) the par value of the stock or shares issued therefor, or (c) in the aggregate 25 per centum of the par value of the total stock or shares of the corporation outstanding on March 3, 1917, whichever is lowest;

"(5) Intangible property bona fide paid in for stock or shares on or after March 3, 1917 [subject to certain limitations not now material]:

"Provided, that in no case shall the total amount included under paragraphs (4) and (5) exceed in the aggregate 25 per centum of the par value of the total stock or shares of the corporation' outstanding at the beginning of the taxable year."

■ The plaintiff's contention is that the value of the good will ought to have been regarded by the Commissioner as "paid-in surplus." This is exactly what it was; the justice of the petitioner's position is undeniable. The difficulty is that, as has been several times expressly decided, it is unadmissible under the statute. Daily Pantagraph v. U. S., 37 F. (2d) 783, 790 (Ct. Cl.); Lafayette-South Side Bank v. Commissioner, 59 App. D. C. 91, 33 F. (2d) 646; Baker & Taylor Co. v. U. S. (C. C. A.) 26 F. (2d) 187. This view of the statute is strengthened by the language of the opinion in LaBelle Iron Works v. U. S., 256 U. S. 377, 389, 41 S. Ct. 528, 531, 65 L. Ed. 998, where it is said of it: "The same controlling thought is carried into the proviso, which relates to the valuation of patents, copyrights, trade-marks, good will, franchises, and similar intangible property. Every line shows evidence of a legislative purpose to confine the account to such items as were paid in for stock or shares, and to their values 'at the time of such payment.' " Pitney, J. The plaintiff's further contention that the statute if so construed is unconstitutional under the Fifth Amendment seems to us untenable in view of the LaBelle Iron Works Case, supra. What Congress undertook to do in the enactment of the provisions of the statute above quoted was to define what should be invested capital in the assessment of federal income and profits taxes. To accomplish this it had to define what could and what could not be included in determining such capital. In doing this we cannot say that it acted so unreasonably as to have violated the Fifth Amendment of the Constitution.

■ Furthermore, that law is a general one applicable, under like circumstances, to all persons subject to federal taxation throughout the United States. The fact that the circumstances affecting a taxpayer in one state may differ from those affecting a taxpayer in another state, due to differences in the laws of the two states, would not render it unconstitutional.

In Phillips v. Commissioner, 283 U. S. 589, at page 602, 51 S. Ct. 608, 613, 75 L. Ed. 1289, where the tax statutes in question related to income and profits taxes, it was stated:

"The extent and incidence of federal taxes not infrequently are affected by differences in state laws; but such variations do not infringe the constitutional prohibitions against delegation of the taxing power or the requirement of geographical uniformity. Florida v. Mellon, 273 U. S. 12, 17, 47 S. Ct. 265, 71 L. Ed. 511; Crooks

v. Harrelson, 282 U. S. 55, 51 S. Ct. 49, 75 L. Ed. 156; Poe v. Seaborn, 282 U. S. 101, 117, 51 S. Ct. 58, 75 L. Ed. 239. Compare Head Money Cases [Edye v. Robertson], 112 U. S. 580, 594, 5 S. Ct. 247, 28 L. Ed. 798; Clark Distilling Co. v. Western Maryland Ry. Co., 242 U. S. 311, 327, 37 S. Ct. 180, 61 L. Ed. 326, L. R. A. 1917B, 1218, Ann. Cas. 1917B, 845."

See, also, Continental Illinois Bank & Trust Co. v. United States (C. C. A.) 65 F.(2d) 506; Gottlieb v. White (C. C. A.) 69 F.(2d) 792.

The law penalizing jurisdictions and parties that were conservative on matters of capitalization is unfair and might well be amended, as was intimated in the Daily Pantagraph Case, supra; but as was there said, "we can only administer the law as we find it."

The next question is whether the Board erred as a matter of law in holding that because the petitioner could not show the value of its patents on March 1, 1913, with mathematical certainty the valuation of $100,000 allowed by the Commissioner must stand. The plaintiff claimed for its patents a value on that date of $1,175,000.

■ The business of the petitioner and its subsidiaries was manufacturing various kinds of machinery, those especially in question here being fans of various kinds, economizers, and steam turbines. They were all protected by patents or licenses owned by the petitioner and acquired by it on various dates before March 1, 1913. These patents were for the most part undeveloped and unlitigated when purchased. The petitioner developed them and protected some of them in litigation. It owned nearly fifty patents. On most of them it made no claim to value. The valuation contended for rests on sixteen patents, in three or four groups. Without undertaking to describe them in detail, it is enough for present purposes to say that on March 1, 1913, they were as a whole a well-collected and valuable group covering the lines of machinery above mentioned. This was so clearly established as not to admit fair doubt or denial. By 1901 the petitioner's business had become unprofitable and unsatisfactory; for the period 1901 to 1908 it made an average annual loss of over $16,000. The old line of machinery on which Mr. Sturtevant relied had by that time become pretty obsolete; the patents on it had largely expired. To meet that situation the managers of the petitioner adopted the policy of acquiring new patents and developing new machinery. It is common knowledge that this is a difficult and an expensive thing to do. One of the sets of patents so acquired related to multi-vane fans, which were a great change from those previously made. These new fans became so successful that they were specified by the United States Navy in its vessels built at the time of the war, and were used to ventilate the Holland Tunnel in New York, and for other important works. They were the outstanding apparatus in that field.

Another set of patents related to steam turbines. These were developed to replace reciprocating steam engines in driving blowers and fans. They were so successful that they superseded reciprocating engines for that purpose, and were largely used by the petitioner in its ventilating apparatus and perhaps for other purposes. A third group of patents related to economizers— a water heating apparatus installed in the flue or chimney to preheat water before it goes into the boiler. These too appear to have been highly successful.

The petitioner's position before the Commissioner and before the Board was that these groups of patents, more or less interrelated and unitary in character and controlling the machines and apparatus referred to, had a very high value for capital purposes. In support of its contention the petitioner called eleven witnesses. On the record they appear to have been honest and unusually competent and intelligent in their statements of fact and opinion.

It is not easy to summarize within the limits of an opinion the solid and convincing character of the evidence submitted by the petitioner as to the value of these patents; but in view of the difference of opinion it seems advisable to do so. Mr. Foss testified, and the figures submitted substantiated his statements, that "from 1903 to 1910 the profits were way down. We then undertook the policy of bringing new things into the business that were akin to the fan business." He then told briefly about the Sturtevant Company getting hold of the four sets of patents under consideration. Mr. Freeman, general manager of the Sturtevant Company, testified to the development of the multi-vane fans, the economizers, the Bentley turbines, and the Allington slow-speed fans, and to the way in which these new inventions fitted into the new business development of the company. With reference to the multi-vane fans

he said: "After the Sturtevant Co. had acquired and perfected the multi-vane fan, the volume of business which used this fan increased and continued so during the life of the patent, except during years of business depression. We started right in with some large orders, such as the power-house of the New York Edison Co. and a great deal of railroad tunnel work. On March 1, 1913, there were just two multi-bladed fans on the market, the Sirocco and the multi-vane, and the business was divided between the two companies. It was a profitable business for the Sturtevant Co. year after year, *the most profitable line we ever had, and it continued in that way during the life of the patent. The multi-vane patent was never disregarded. * * * The excess of profits from the multi-vane fan for the five and a half years previous to March 1, 1913, over the profits from a similar amount of the non-patented articles was nearly $100,000 a year,—$99,000 and some odd hundreds at that time.*" (Italics supplied.) He then described the Allington slow-speed fans which were developed and supplemented the multi-vane fans, being used for somewhat different purposes.

With respect to the Bentley turbines, Freeman, who joined the organization in 1903, testified that "prior to 1904 fans and blowers were largely driven by reciprocating steam engines or by belting from motors"; that "the volume of this business began to decrease, because the turbine had come into existence and was driving our auxiliary reciprocating steam engines out of business. We had to buy turbines to satisfy customers and we decided that the Company must, to protect its own interests, go into the turbine business." The Snow turbine which the company developed in 1906 and 1907 proved a failure. The development of the Bentley turbines was begun in 1910. "It was apparent by March 1, 1913, that the Bentley turbine was a success. * * * From 1913 there was a gradual increase, and then a sudden peak, due to the abnormal demand for naval use during the war, then it dropped back again and has gradually increased since that time." Freeman stated that in his opinion the multi-vane fan patents were worth at least $600,000 as of March 1, 1913; that the Bentley turbine patents were worth at that time $400,000 or $500,000, the license on the slow-speed fans at least $80,000, and that the economizers' patents were worth more than $178,000. He made this valua-

tion on "the probable profit producing features of these patents * * *. It is the income producing feature of a patent that makes it valuable. Even if the net income of the Company before 1913 was less than ten per cent on its net tangibles, the value of the patents was over a million dollars, because we were just starting to get the benefit from them; the real benefit was to come after that time."

The figures of sales amply bear out these last statements. Freeman further testified that: "The total net profit of the company for the six months ending December 31, 1912 was $82,679.66; the profits of the patented articles for that period which I ascribe to multi-vane fans were $103,000, $1,570 on the turbine, $19,491 on the economizers and $7,078 on the slow-speed fans." In other words, the patented articles were then carrying the business. He continued: "In the five and one-half year period *just before 1913* (italics supplied) the sales of multi-vane fans were $1,166,699 and the profit $595,776. * * * We were selling $600,000 to $800,000 worth of ventilating fans a year and these were rapidly taking the place of other ventilating fans. * * * Ninety-nine per cent of the patents issued are not worth anything; occasionally one is worth money if a company undertakes to develop it, and that is exactly what happened in this case."

Mr. Williams, a research and consulting engineer employed by the petitioner, testified that the multi-vane fan was a great advance. "There had been no important development in the design of fans prior to the introduction of the Sirocco and multi-vane types. * * * The market was very ready and willing to take it. One of the first large contracts was the Pennsylvania Terminal in New York City where there were thirty fans in the installation, running from medium sizes to a size in height that would not go into this courtroom. This was before March 1, 1913. About this time there was a contract for some navy ships. * * * They gave us a contract at quite a preferential price. We not only saved them space but we saved them horse-power. * * * Immediately after the first naval installation the navy department changed their ventilation specifications to absolutely require fans of the multi-vane construction, and that requirement still exists in their specifications to this day." From 1913 to 1924 the average annual sales on these fans amounted to more than half

a million dollars. "Within four or five years we were obtaining 80 per cent of the navy business."

The petitioner's principal expert was Mr. Orrok, consulting engineer for the New York Edison Company, and thirty or forty other corporations, who had taught engineering in the Brooklyn Polytechnic Institute, Yale, and Harvard. He was familiar with the petitioner's apparatus for many years, having bought it from time to time for various clients. He explained that the new type of fan developed by the petitioner and made only by the petitioner and the Sirocco Company was on March 1, 1913, in greatly increasing demand; that the old type of fans was being superseded by it; that "a number of companies tried to develop fans, but they were not very successful. My impression is that the Sturtevant and Sirocco would practically do at least three-fourths of the total fan business in the country. * * * At March 1, 1913, there was a great increase in dèmand for this new type of fan. * * * Ventilation of buildings from 1910 onward kept increasing at a very rapid rate; the subways were built; they required a lot of ventilation; tunnels in various places had to be ventilated; there was a change in the mine ventilating business; the old type of fans of 30 or 40 feet in diameter were superseded by these smaller fans of less diameter; there was a great increase in the amount of forced draft and induced draft required in power stations; we are using more air and burning more coal in the same space all the time." As has been said, this testimony was uncontradicted. It is clear that the Sturtevant Company and the Sirocco Company were pioneers in important changes in practice in ventilation, forced draft, etc. Mr. Orrok testified that he considered the fair market value of the Hancock patents under which the multi-vane fans were built to be on that date "somewhere around $700,000."

As to the Bentley turbine patents, Mr. Bentley testified that: "On March 1, 1913 the conditions were very favorable, and I felt without doubt that we would do upwards of $400,000 or $500,000 a year of turbine business. That estimate was based on the fact that we had an exceptionally efficient turbine and there was a big field coming in with greater and greater demand for turbines; and the estimate corresponds very closely with *what actually did occur.*" (Italics supplied.) Mr. Orrok testified as

to the turbine patents that he had bought his last reciprocating engine for ventilating purposes in 1907; that the small steam turbine was much better; that he had a test crew that did nothing else but test these small turbines and other auxiliary engines; that other people made steam turbines at the time in question; that he thought the turbines made under the petitioner's patent were "equally good with anybody else's. * * * We liked them and we bought them. * * * I saw a great deal of prospect for expansion in the use of the turbines in 1913. I recommended to quite a number of people to go into the turbine business. * * * I was anxious to have real competition." He valued the petitioner's turbine patents at about $323,000. The evidence also showed substantial value for the economizer patents and the slow-speed fans. We cannot undertake to state it.

Excepting the estimates of value, the petitioner's evidence dealt with facts, with the character of the patented inventions, and their places and usefulness in the commercial field. If it had been false or exaggerated, it would have been easy for the Commissioner to call witnesses to say so and to state the truth. No such evidence was introduced. The case was submitted to the Board on the petitioner's evidence as to the facts. At one time the Sirocco Company claimed that the petitioner's fans, or some of them, infringed its patents and brought suit against the petitioner on that ground. The suit was dismissed and the Sirocco patent held invalid by the Circuit Court of Appeals in the Second Circuit (Sirocco Engineering Co. v. B. F. Sturtevant Co., 220 F. 137).

It appeared that the Sturtevant Company had during the development of the patents in question kept complete and accurate cost accounts from which profits were figured. The original time cards and detailed entries had for the most part not been retained. The original compilations from them, however, had been retained and were used by the accountants in preparing schedules of profits allocated to the different patents. Elaborate sheets of figures were produced based on the company's books to show the profits attributable to the patents. Mr. Albee, a certified public accountant, testified that he had investigated this question for the Sturtevant Company. He described the methods which he used. He testified: "I found the total profit from multi-vane fan patents for the five and one-

half years in question (1907–8 to end of 1912) to be \$548,389.99 and the average per year \$99,707.27." By another method of computing the average annual profits from these patents over the same period he found them to be \$95,564.50. These profits increased sharply, beginning with \$7,800 for 1908 and amounting to \$173,941.07 for 1912,—which strongly supports the testimony of the witnesses. What is called Hoskold's formula is sometimes used for determining the value of patents. This formula applied to the profits so stated gave a value to the fan patents of from \$548,000 to \$572,000. The value of the economizer patents computed in a similar way amounted to \$88,000 to \$96,000. A similar computation on the slow-speed fan patents gave values of from \$75,000 to \$77,000. The value of the turbine patents was difficult to estimate because the turbines were usually sold in connection with other apparatus and were also in competition with turbines made under patents owned by other companies. We cannot undertake to state this situation in detail. As has been said, Mr. Orrok, who appears to have been extremely well informed on the subject, regarded the Bentley patents as decidedly valuable. There was testimony that the sale of turbines for naval use *"had been as high as \$2,000,000 a year during the war."* Mr. Freeman testified: *"Practically all naval ships have been equipped with multi-vane blowers and ventilation since we first established the multi-vane blower. We have had at least 90 per cent of the ventilation work for the navy using the multi-vane fan because of its efficiency and small space and low weight."* The other witnesses called by the petitioner were persons holding important positions in its organization or in other business. Their testimony supported the petitioner's contention that its line of machinery and apparatus protected by the patents in question was highly thought of and widely sold and that the patents were very valuable.

Against this evidence the Commissioner called only two witnesses. The first was an accountant who after having attended a school of accounting had been continuously in the government service except for one year with a private concern. He testified particularly with reference to the effort which the petitioner had made to demonstrate the value of the patents by the profits which appeared to be attributable to them as shown by its books. As the

books had not been kept for any such purpose, difficulties were involved. It appeared, however, that over a period of *eleven years* with total sales of over \$11,000,000, the petitioner's account checked within an error of about \$19,000, one-sixth of one per cent. All the petitioner's books and records were placed at the disposal of the government, and they were in fact examined by the government accountant before the hearing. He testified inter alia that he examined about 100 sheets of the petitioner's figures on fans, each sheet having about 60 lines and each line from one to fifteen fans. He found five errors which he specified. One of them was that an order for three fans was entered as an order for two; one, that a seven and one-half per cent. discount on a small sale was not shown; one was an understatement of a sale by \$62.50; one was the omission of an order for two blowers; and one concerned apportionment of freight and discount on a sale of fans. The trivial character of such criticism considering the question on which the evidence was offered is obvious, but it fairly reflects the witness' approach to the matter. He said: *"I am looking at this from an accounting standpoint and trying to get an absolutely accurate figure or none at all."* In checking over the petitioner's gross business for five and one-half years this witness said he found an error of about \$50,000. The character of this error was not clearly stated and the existence of it was denied. Even if true, it would throw little light on the value of the patents. One figure, that for tangible assets, rejected by him and by the Board on the ground that it was compiled "in an arbitrary manner," had been originally arrived at by the Bureau of Internal Revenue and accepted by the petitioner. It was agreed that the petitioner's system of keeping costs was as good as the average at that time. This witness testified only on the accounting aspect of the matter. His testimony had a very remote bearing if any on the question of values.

The only other witness who testified for the government was by training a mining engineer; he had worked in the Winchester Arms Plant, in what capacity is not stated; he had served as an ordnance engineer during the War and thereafter had been continuously in the employ of the government as a "valuation appraisal engineer." In that capacity he had done a great deal of valuation for the government, hav-

ing appraised for it industrial property, real estate, patents, copyrights, trade-marks, and licenses. He testified that in his opinion the patents in question were not worth more than $60,000, an amount which at the time of his examination had already been spent by the taxpayer in litigation fees on one of the multi-vane fan patents. This witness testified that he did not value the patents as individual patents or as groups; that he did not know to what extent multi-vane fans are used in the United States Navy or in central power stations; that he heard the testimony of Mr. Freeman as to the demand for fans, "but of course Mr. Freeman is an official of the Company and looks at his side of the question with rose-colored glasses no doubt." *"My answer is based upon my experience in valuing patents for the Internal Revenue Bureau in cases such as this."* (Italics supplied) As to the turbine patents he said: "I can not express an opinion whether the turbines manufactured under the Bentley patent (the petitioner's) were more or less efficient for auxiliary use than turbines manufactured under other patents in competition with them. * * * I do not know whether there was any general movement at that time (1913) away from reciprocating steam engines and in favor of turbines."

By legal standards it would seem extremely doubtful whether this witness qualified as an expert on values. The basis of such qualification is a knowledge of values placed upon similar property by persons dealing with it. He seems to have had no knowledge of that character, to have known nothing about market values or what was customarily paid for such property as he undertook to put a valuation on. Nor was he familiar with commercial conditions in the field to which the patents which he valued related. How patents could be valued without such knowledge we do not see. He knew what values he himself, acting for the government, had put upon enormous amounts of property of many different kinds, a very different sort of knowledge and experience from that which is required to qualify an expert on valuation to testify in court proceedings. Of course the Board of Tax Appeals, as administrative body, is not bound by the rules of evidence which prevail in legal proceedings, but it is bound as was said by this court in respect to immigration proceedings by the rules of common sense and fair play. Mason ex rel. Lee Wing You v. Tillinghast (C. C. A.) 27 F.(2d) 580.

The Board unfortunately permitted itself to be led astray and to treat the question before it as if it were primarily one of accounting, which of course it was not. The Board said: "We accordingly conclude that the formula worked out by the petitioner can not be accepted as establishing the values at March 1, 1913." In its opinion are many references to the "formula" for valuation, and nowhere any recognition of the indubitable facts as to the business situation of the petitioner which we have outlined. This method of dealing with the matter seems to us to be so unusual and so unreasonable as to be erroneous as a matter of law. It is well established that the valuation of patents is a question of fact to be determined on all the evidence (see Nice Ball Bearing Co., 5 B. T. A. 484); and there must be a bona fide attempt to apply the evidence to the question presented.

Only questions of law are raised in a petition for review of the decision of the Board of Tax Appeals. Phillips v. Commissioner, 283 U. S. 589, 600, 51 S. Ct. 608, 75 L. Ed. 1289; Avery v. Commissioner (C. C. A.) 22 F.(2d) 6, 55 A. L. R. 1277. But see too Helvering, Commissioner, v. Taylor, 293 U. S. 507, 55 S. Ct. 287, 79 L. Ed. ——, January 7, 1935; and Mead Coal Co. v. Commissioner, 72 F.(2d) 22 (C. C. A. 4). While this court may not challenge the facts found by the Board, if supported by some substantial evidence, deduction from the facts so found, if clearly erroneous, raises a question of law. When the Board held that, because the petitioner did not prove what was the fair market value of the patents on March 1, 1913, to its satisfaction and the satisfaction of its accountant, the figure allowed by the Commissioner must stand, we think it erred as a matter of law. Helvering v. Taylor, supra. Blackmer v. Commissioner (C. C. A.) 70 F.(2d) 255, 92 A. L. R. 982. From the evidence offered as to the earnings from the four principal patented articles during the five years prior to March 1, 1913, and the prospect of future sales on that date, and the opinion of witnesses familiar with the value of patents, we think only one reasonable conclusion could be arrived at, namely, that the taxpayer's patents had a value on March 1, 1913, far in excess of $100,000. That such value could not be shown to a math-

ematical certainty did not relieve the Board of the burden of determining what it was in excess of the sum allowed by the Commissioner. Helvering v. Taylor, supra. Courts and juries often have to fix values and damages when they cannot be reduced to a definite sum by computation. Good business judgment must then determine, and a failure or refusal to exercise that judgment constitutes an error of law. Conrad & Co. v. Commissioner, 50 F.(2d) 576 (C. C. A. 1); Blackmer v. Commissioner (C. C. A.) 70 F.(2d) 255, 92 A. L. R. 982. See, too, Tracy v. Commissioner, 53 F.(2d) 575 at page 579 (C. C. A. 6); Plaut & Co. v. Commissioner (C. C. A.) 46 F.(2d) 306; Cohan v. Commissioner (C. C. A.) 39 F.(2d) 540; Sioux City Stock Yards Co. v. Commissioner (C. C. A.) 59 F.(2d) 944. In some of these cases no value whatever was allowed by the Board. But the matter does not depend on any technicality. The test is as above stated. The findings of the Board must be set aside and the entire question reheard.

The final point is whether the petitioner was entitled to an allowance for amortization of war facilities. There is no controversy about the facts. In October, 1917, the petitioner was requested by the Navy Department to build an extension to its machine shop and an additional high-pressure boiler and power plant, the latter being required for certain special work done for the government. The extensions and improvements were made on land of the petitioner and were of such character as not to be removable. The entire cost of them was paid by the government. The contract between the petitioner and the government provided: "It is understood that upon completion of this work (i. e. the war work) an appraisal will be made of the value to you (the petitioner) at that time of the extension and improvement of this plant, and that you will reimburse the government in an amount equal to the appraised value thereof." The additions to the petitioner's plant and equipment made under this contract were used to speed the production of forced draft machinery for naval destroyers. After the last of the machinery called for had been manufactured and shipped, in 1919, an appraisal of the plant and equipment was made as provided in the contract; and an award was made under which the petitioner paid the United States $77,000, as the value to the petitioner at the time of the extensions and improve-

ments. The petitioner now claims an amortization allowance on said extensions and improvements attributable to the year 1918 and the first three months of 1919 amounting to about $50,000. The Revenue Act of 1918 provided:

"(8) In the case of buildings, machinery, equipment, or other facilities, constructed, erected, installed, or acquired * * * for the production of articles contributing to the prosecution of the present war * * * there shall be allowed a reasonable deduction for the amortization of such part of the cost of such facilities * * * as has been borne by the taxpayer. * * * At any time within three years after the termination of the present war the Commissioner may, and at the request of the taxpayer shall, reexamine the return, and if he then finds as a result of an appraisal or from other evidence that the deduction originally allowed was incorrect, the taxes imposed by this title and by Title III for the year or years affected shall be redetermined," etc. [Revenue Act of 1918, § 234 (a) (8), 40 Stat. 1077, 1078.]

The Revenue Act of 1926 continued these provisions of the Act of 1918, with the condition, however, "if claim therefor was made before June 15, 1924." Section 1209 (26 USCA § 1072).

The Board of Tax Appeals held in effect that the amortization provisions above referred to did not apply to the present situation; that "the $77,000 cost to the petitioner was not the cost of war-time facilities, but was rather the cost to it of facilities which it proposed to use for manufacturing post-war articles." We think this conclusion is correct. The contract provided for the situation which would arise when the war was over and war-time facilities were no longer required by the petitioner or could be profitably used by it. The entire cost of the extensions and improvements having ben paid in the first instance by the government as a war measure, the petitioner reimbursed the government only to the extent of their value to it for post-war use. This was in effect an amortization of the war-time value. The cost of such facilities was not borne by the taxpayer within the meaning of the statute. We do not think the statute applies to the facts presented.

It follows that the decision of the Board of Tax Appeals must be reversed and the case remanded to the Board for further proceedings in accordance with this opinion.

The decision of the Board of Tax Appeals is reversed, and the case is remanded to that Board for further proceedings not inconsistent with this opinion.

BINGHAM, Circuit Judge (dissenting).

I agree that the first and third questions considered in the opinion of the court are properly decided. My only doubt is as to the second question—the value of the patents and licenses. As to that I doubt very much whether this court is authorized in finding that the conclusion of the Board of Tax Appeals was arbitrary and warrants the setting aside of its order or decision.

The evidence shows that the cost of the patents and licenses to the taxpayer, including legal expenses, etc., was about $100,000. E. B. Freeman, vice president and general manager of the Sturtevant Company, who had been with that company since 1903, was called as a witness by it and, although in his opinion the value of the patents and licenses "was approximately $1,300,000 or somewhat in excess of a million dollars," he testified that "the average net income of the company for a period of five years prior to March 1, 1913, was slightly in excess of $200,000 per year"; that "the net tangible assets were worth between three and four million dollars"; that "one would generally expect to make 10 per cent net on the tangible assets"; and that "ten per cent would be a fair return on the net tangible assets in this type of business." (Record, p. 108.) And Exhibit 7, introduced by the Sturtevant Company and found on page 275 of the record, shows that for the four years preceding 1913 the average capital of the company was $2,517,631.86 and the average net earnings or profits were $257,041.09, or, as Mr. Freeman testified, slightly in excess of $200,000; and, pursuing the formula outlined by Mr. Freeman and assigning 10 per cent. of the profits to the tangible assets, or $251,763.19, you would have left as the net profits assignable to the intangibles, the patents and licenses, the sum of $5,277.90. This sum capitalized at 6 per cent. would produce a value for the patents and licenses of $87,965, and capitalized at 5 per cent. would produce a value for them of about $105,558.

If any reliance can be placed on this schedule of the Sturtevant Company, it shows the average yearly profits just preceding 1913, or the year in which it is sought to determine the value of the patents and licenses; and if any reliance can be placed on the testimony of its vice president and general manager, the average yearly profits assignable to the patents and licenses would produce a value for them nearer $90,000 than $100,000, if capitalized at 6 per cent., and that they were not worth more than the Commissioner and the Board of Tax Appeals found, if they were that. And it seems to me that we would be going a good ways to find that the Board, in its finding that the patents and licenses were not worth more than $100,000, acted arbitrarily and without any legal basis because they declined to give any substantial weight to opinion evidence of witnesses called by the company and based on doubtful premises, as were the figures used as a basis for their opinions.