T.C. Memo. 2000-12

UNITED STATES TAX COURT

ESTATE OF BEATRICE ELLEN JONES DUNN, DECEASED,
JESSE L. DUNN, III, INDEPENDENT EXECUTOR, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 2312-95.                    Filed January 12, 2000.

<u>David C. Allie</u> and <u>Walter B. Thurmond</u>, for petitioner.

<u>Richard T. Cummings</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GALE, <u>Judge</u>:  Respondent determined a deficiency in
petitioner's Federal estate tax of $238,515.05, which by
subsequent amendment to the answer was increased to $1,100,000.
After concessions, the sole issue remaining for decision is the
fair market value of 492,610 shares of stock in Dunn Equipment,

Inc. (Dunn Equipment), owned by Beatrice Ellen Jones Dunn (decedent) on the date of her death, the valuation date. Unless otherwise noted, all section references are to the Internal Revenue Code in effect at the time of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

                          FINDINGS OF FACT

Some of the facts have been stipulated and are so found. We incorporate by this reference the stipulation of facts, the supplemental stipulation of facts, and the attached exhibits.

Decedent died on June 8, 1991, at the age of 81. Jesse L. Dunn III (Mr. Dunn), decedent's son, is the executor of the Estate of Beatrice Ellen Jones Dunn (estate). At the time of filing of the petition in this case, the estate was administered in Texas City, Texas, and Mr. Dunn resided in Dickinson, Texas.

At the time of her death, decedent owned 492,610 shares of stock in Dunn Equipment representing 62.96 percent of the total outstanding shares. At decedent's death, Dunn Equipment was a family-owned and family-operated company. Dunn Equipment used a fiscal year ending March 31 for tax and financial reporting purposes. Dunn Equipment was incorporated in Texas in 1949. As of the valuation date, Dunn Equipment operated from four locations in Texas and had approximately 134 employees, three of whom were executives and eight of whom were salesmen. The

primary business of Dunn Equipment was the renting (to refinery and petrochemical businesses) of heavy equipment such as cranes, air compressors, backhoes, man lifts, sanders, and grinders (collectively, "equipment"), as well as providing operators for such equipment. Crane rentals accounted for more than 50 percent of the revenues of Dunn Equipment. Although one of Dunn Equipment's locations rented smaller equipment, such rentals accounted for less than 5 percent of the company's revenues. Dunn Equipment charged an hourly rate for both the equipment and the labor. For fiscal years 1988 through 1991, the portion of revenues attributable to labor, parts, and rentals of operated equipment (i.e., equipment for which an operator was also supplied) ranged from 26.3 to 32.7 percent. In addition to the equipment, the tangible assets of Dunn Equipment included several parcels of industrial real estate with a total appraised value of $1,442,580 and a townhouse valued at $35,000.

The capital stock of Dunn Equipment consisted of 786,455 shares, of which decedent owned 492,610, or 62.96 percent, and Mr. Dunn owned 243,770, or 31.12 percent. Decedent, Mr. Dunn, and Peter Dunn were directors of Dunn Equipment. Mr. Dunn was president of Dunn Equipment, and Peter Dunn was vice president. Until her death, decedent served as secretary-treasurer of Dunn Equipment. Mr. Dunn's sole compensation from Dunn Equipment during the period of fiscal year 1988 through fiscal year 1991

was $3,750 in fiscal year 1989. Peter Dunn received compensation of $45,550, $48,050, and $51,550 in fiscal years 1989, 1990, and 1991, respectively. Decedent received compensation of $131,463 in fiscal year 1988 and $120,700 in each of fiscal years 1989 through 1991. The compensation paid to the officers of Dunn Equipment was lower than the amount paid to officers of similarly situated companies.

As of the valuation date, Dunn Equipment had been in the heavy equipment rental business for more than 40 years and was the largest heavy equipment rental business in its area of operation. Because Dunn Equipment's service and reputation were superior to its competitors', it held a substantial share of the market for heavy equipment rentals and was able to command rates above market. Ten large petrochemical firms accounted for 45 percent of its revenues. During the period from 1987 through the valuation date, economic conditions were favorable for the petrochemical industry because of low feedstock prices. Consequently, Dunn Equipment's revenues increased over the period. However, the heavy equipment rental market also became increasingly competitive during this period because cranes became more readily obtainable and hourly rental rates declined. Because of the competitiveness in the market, Dunn Equipment had not increased its rental rates for more than 10 years. Furthermore, in order to remain competitive, Dunn Equipment

continuously had to replace its equipment and spent an average of $2 million per year for such replacements. Also, direct operating expenses increased significantly in 1988 as Dunn Equipment began to rent equipment from third parties when its own equipment was leased out. The company would only break even on these rentals. Direct operating expenses continued to increase from 42 percent in 1988 to 52 percent in the 12-month period ending May 31, 1991.

Dunn Equipment did not pay any dividends from 1987 through 1991. As of the valuation date, there was no public market, or recent private transactions, in the stock of Dunn Equipment and no current or pending litigation that could have had a material adverse effect on its value.

OPINION

The issue in this case is the fair market value, for Federal estate tax purposes, of decedent's 62.96-percent share of stock in Dunn Equipment on June 8, 1991, the valuation date. In the Federal estate tax return, decedent's shares in Dunn Equipment were valued at $3.32 per share, for a total amount of $1,635,465 at her date of death. In the notice of deficiency, respondent determined that the fair market value of decedent's Dunn Equipment stock at such time was $2,229,043. Subsequently, by amendment to answer, respondent claimed a value for the stock of $4,430,238, which resulted in an increase in the deficiency of

$861,485, for a total deficiency of $1,100,000.  Consequently, petitioner bears the burden of proof to show error in respondent's initial determination of a $2,229,043 value in decedent's Dunn Equipment stock, whereas respondent bears the burden of proving any value in excess of the initial determination.  See Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933); P.D.B. Sports, Ltd. v. Commissioner, 109 T.C. 423, 444 (1997).

The dispute in the instant case concerns the proper method for valuing an interest in a company in which asset-based value and earnings-based value are widely divergent.  Petitioner argues that the value of decedent's 62.96-percent interest should not exceed $1,582,185, based on a 50-50 weighting of asset- and earnings-based values.  Respondent, on the other hand, argues that the value of decedent's interest is equal to 62.96 percent of Dunn Equipment's net asset value, minus an appropriate discount for lack of marketability and lack of super-majority control, for a final value of $4,430,238.

Fair market value is defined as "'the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts.'"  United States v. Cartwright, 411 U.S. 546, 551 (1973) (quoting sec. 20.2031-1(b), Estate Tax Regs.).  The best method to value a

corporation's stock is to rely on actual arm's-length sales of the stock within a reasonable period of the valuation date. See Estate of Andrews v. Commissioner, 79 T.C. 938, 940 (1982). There were no such sales of Dunn Equipment stock. In the absence of such sales, fair market value is determined from the value of stock in corporations engaged in the same or similar business as well as other factors relevant to value. See sec. 2031(b). Under section 20.2031-2(f), Estate Tax Regs., these other factors include the company's net worth, its prospective earning power and dividend-paying capacity, its goodwill, its position in the industry, its management, the economic outlook in the industry, the degree of control represented by the block of stock to be valued, and the values of stock of corporations engaged in the same or similar lines of business listed on a stock exchange. Because the record is devoid of any evidence regarding the value of stock in companies engaged in the same or a similar business, we determine fair market value by considering other factors relevant to value.

Both parties rely on expert opinion. Expert opinion sometimes aids the Court in determining valuation; other times, it does not. See Laureys v. Commissioner, 92 T.C. 101, 129 (1989). We evaluate such opinions in light of the demonstrated qualifications of the expert and all other evidence of value in the record. See Estate of Newhouse v. Commissioner, 94 T.C. 193,

217 (1990). We are not bound, however, by the opinion of any expert witness when that opinion contravenes our judgment. See id. We may accept the opinion of an expert in its entirety, see Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 452 (1980), or we may be selective in the use of any portion thereof, see Parker v. Commissioner, 86 T.C. 547, 562 (1986).

Petitioner's experts were William H. Frazier (Mr. Frazier) of Howard Frazier Barker Elliot, Inc., and Shannon P. Pratt (Mr. Pratt) of Willamette Management Associates. Respondent's expert was Carmen R. Eggleston (Ms. Eggleston) of Price Waterhouse LLP. All three experts authored reports and testified at trial. Mr. Frazier's report estimated the fair market value of the stock. Ms. Eggleston's report critiqued Mr. Frazier's report but did not independently value the stock. Mr. Pratt's report also did not independently value the stock in issue but instead reviewed Mr. Frazier's report and critiqued Ms. Eggleston's report.

## I. Weighting the Values

Mr. Frazier calculated an earnings-based value using capitalized net income and an asset-based value using what he considered to be the liquidation value of the company. For his final value, he gave each of these a weight of 50 percent. Respondent argues that no weight should be given to earnings-based value and moreover that the correct asset-based value is fair market value of the underlying assets rather than

liquidation value. Respondent also argues that, in the event we consider an earnings-based value, the correct method for calculating it is to capitalize net cash-flow rather than net income.

We believe that Mr. Frazier's approach puts too much emphasis on the likelihood, and assumed effect, of liquidation and in addition that Mr. Frazier's approach incorrectly capitalized net income. On the other hand, we believe that respondent puts too much emphasis on the fair market value of assets. We find that the value of Dunn Equipment is best represented by a combination of an earnings-based value using capitalization of net cash-flow and an asset-based value using fair market value of assets, with an appropriate discount for lack of marketability and lack of super-majority control.

Respondent and his expert, Ms. Eggleston, argue that because of the large disparity between net asset value and earnings value, earnings value should be disregarded. They further argue that net asset value represents a minimum value for Dunn Equipment. We reject both of these positions. Respondent's approach would require us to disregard completely the significant operational aspects of the company in determining fair market value. But Dunn Equipment was a viable operating company as of the valuation date and earned a significant part of its revenues from selling services as well as renting equipment.

Approximately 26 to 33 percent of Dunn Equipment's gross operating revenues was earned from labor, parts, and equipment rentals (including the supplying of operators), and Dunn Equipment had 134 employees at this time. Thus, even though Dunn Equipment's primary business was the leasing of heavy equipment, there were significant active operational aspects to the company as of the valuation date.

Certainly neither Ms. Eggleston in her report nor respondent on brief has provided an explanation as to why the existence of a large disparity between earnings value and net asset value is, by itself, a sufficient basis for disregarding the earnings approach. We do not believe that the disparities in this case indicate the appropriateness of one approach to the exclusion of the other. Respondent and Ms. Eggleston repeatedly criticize Mr. Frazier for failing to "reconcile" the disparate values obtained in his report. But they are far more guilty of this than Mr. Frazier. Rather than reconcile the two values, both respondent and Ms. Eggleston simply assume that with proper adjustments the greater value, i.e., the asset-based value, is the correct one. Although we found her report useful with respect to certain issues, we note that Ms. Eggleston is not an appraiser, but instead works in the dispute analysis and corporate recovery division of Price Waterhouse LLP and further that she did not perform an independent appraisal of the stock in issue. We

evaluate the opinion evidence of an expert in light of the qualifications of the expert.  See Parker v. Commissioner, supra at 561.  In light of the significant operational aspects of Dunn Equipment, the size of the block of stock in issue, the identity and attitudes of the remaining shareholders and directors, and the costs associated with liquidation, we conclude that the hypothetical investor would give earnings value substantial weight.

It is well established that, as a general rule, earnings are a better criterion of value for operating companies and net assets a better criterion of value for holding or investment companies.  See Rev. Rul. 59-60, 1959-1 C.B. 237, 242; Estate of Newhouse v. Commissioner, 94 T.C. at 217 (Rev. Rul. 59-60 "has been widely accepted as setting forth the appropriate [valuation] criteria").  Thus, because Dunn Equipment was an operating company, the better question is not whether we should disregard the earnings-based value, but whether we should disregard the asset-based value.  In Estate of Andrews v. Commissioner, 79 T.C. at 945, we stated:

> regardless of whether the corporation is seen as primarily an operating company, as opposed to an investment company, courts should not restrict consideration to only one approach to valuation, such as capitalization of earnings or net asset values. Certainly, the degree to which the corporation is actively engaged in producing income rather than merely holding property for investment should influence the weight to be given to the values arrived at under the different approaches but it should not dictate the use

of one approach to the exclusion of all others.
[Citations and fn. ref. omitted.]

Similarly, in the instant case we shall not disregard asset-based value, in particular because there are certain aspects of Dunn Equipment that point to the use of asset-based value. This was acknowledged by Mr. Frazier in his report and by Mr. Pratt in testimony, and although we disagree with aspects of both Mr. Frazier's and Mr. Pratt's positions, we agree with the basic decision to give some weight to asset-based value as well as earnings-based value.

Mr. Frazier believed there was a substantial likelihood of liquidation, given that the company's return at the valuation date was lower than the return on risk-free investments such as Government bonds. He assumed a 50-percent chance of liquidation. Therefore, he calculated an asset-based value of the company equal to what he considered to be its liquidation value[1] and gave that value 50 percent of the weight of total value. He also calculated an earnings-based value and gave that value the remaining 50 percent of the weight of total value.

We find that Mr. Frazier's method overestimates the likelihood of liquidation. Although decedent's shares represent

---

[1] There is no question that Mr. Frazier did not consider all the costs of liquidation, such as the costs involved in selling and transporting equipment, and the reduced sales price for equipment due to the increased short-term supply resulting from a liquidation.

a controlling interest with respect to day-to-day management of Dunn Equipment, a holder of these shares nonetheless would lack the power to compel a liquidation, a sale of all or substantially all the assets, or a merger or consolidation of the company, all of which would require the approval of at least 66-2/3 percent of the outstanding shares. See Tex. Bus. Corp. Act Ann. art. 6.03 (West 1991). In addition, based upon the company's history, its community ties, and its relationship with its employees, we believe it would be difficult finding enough additional shareholders to agree to liquidation. Mr. Frazier testified that the other shareholders were committed to operating the company, expecting that the returns would eventually increase. The executor, Mr. Dunn, testified that all the shareholders would object to liquidation. Thus, despite the inadequate return on assets and correspondingly low earnings value, the likelihood of liquidation was relatively low. Finally, even assuming a sufficient number of additional consenting shareholders could be found, the process of liquidation itself would have been costly and time consuming. A rapid liquidation would have flooded the market with equipment, reducing the value obtained for each piece. A lengthy, drawn-out liquidation (also called a "creeping liquidation") would have risked the loss of customers who, at some point, would have realized that Dunn Equipment no longer

meant to stay in business and who would therefore have sought other suppliers of equipment.

The lower likelihood of liquidation affects value in two ways. First of all, in calculating an asset-based value, we believe it is improper to use liquidation value, which understates the value of Dunn Equipment to the hypothetical buyer.[2] Second, even assuming a reduced likelihood of liquidation, the hypothetical buyer and seller would still consider asset value to be an important factor in reaching a price for the shares in question. This is the result of the disparity in value between the earnings- and asset-based values. In the face of that disparity, we believe that the earnings value is too low, primarily because Dunn Equipment was engaged in a cyclical business, and it was at the low point of the cycle at the valuation date. The testimony of both of petitioner's experts supports this conclusion. They both testified that Dunn Equipment's relatively low earnings were not due to poor management but merely due to the business cycle and the current climate of competition in the field. Essentially, Dunn Equipment had to weather a period of low returns in order to maintain market share, because of the competitive pricing in the equipment

---

[2] On a related point, we also believe that Mr. Frazier's approach misconstrued the effects of liquidation. We discuss this point in greater depth below, in the more detailed discussion of Mr. Frazier's calculations.

rental business and the need to satisfy customers with new equipment to rent. However, the reason Dunn Equipment was willing to weather the low period was because of a belief, well founded in our view, that the business would eventually rebound. It follows, therefore, that earnings projections based on the low period of the cycle would misrepresent the earnings value of the company. For this reason, we believe the hypothetical buyer and seller would give asset value considerable weight.

In allocating weight among the values determined under each approach, we have considered the degree to which Dunn Equipment was actively engaged in producing income, the nature of its business, market conditions, the economic outlook, the company's history, its financial and business experiences and situation, the size of the block of stock in issue, and the identity, attitudes, and intentions of the remaining shareholders.[3] See Ward v. Commissioner, 87 T.C. 78, 102 (1986); Estate of Andrews v. Commissioner, 79 T.C. at 945. Due to other factors relevant to value such as low profitability, volatility of earnings, high debt, limited customer base, and dependence upon one industry, we

---

[3] Respondent argues that the plans and intentions of the remaining shareholders and directors of Dunn Equipment should be disregarded under the hypothetical sale test. This argument is without merit. It is only the willing buyer and willing seller that are hypothetical; otherwise, the process of valuation considers actual conditions as they existed at the time of valuation. See Estate of Newhouse v. Commissioner, 94 T.C. 193, 218 (1990).

give net asset value the greater significance. Based upon the foregoing, we find that fair market value is best represented by an allocation of 65 percent to net asset value and 35 percent to earnings value.

## II. Calculating Earnings- and Asset-Based Value

### A. Earnings-Based Value

In his report, Mr. Frazier computed an earnings base and then divided that figure by a capitalization rate to compute the present value of Dunn Equipment's future income stream. None of the parties or their experts challenges the capitalization rate of 21.67 percent used by Mr. Frazier, and we accept it. The dispute turns on whether Mr. Frazier used the proper earnings base. Mr. Frazier believed that the proper earnings base was net income, while Ms. Eggleston and Mr. Pratt believed it was net cash-flow to equity. In general, we agree with Ms. Eggleston and Mr. Pratt.[4]

Mr. Frazier's capitalization rate was based on a study by Ibbotson Associates, which, according to Mr. Frazier's report, gives the average total annual returns for small company stocks over the return on long-term Government bonds. Thus, we find that Mr. Frazier's rate of return is appropriate when considering

---

[4] On the other hand, Mr. Pratt believed that, in the instant case, Mr. Frazier's figure for net income adequately represented net cash-flow and that therefore, ultimately, Mr. Frazier's use of net income did not produce erroneous results. We disagree, for reasons discussed below.

the total returns of Dunn Equipment, i.e., net cash-flow to equity, not just net income. Mr. Frazier contended that he could not capitalize net cash-flow because the net cash-flow was negative for the period of fiscal years 1987 through 1991 and there was no expectation of net cash-flow in the future. We disagree. Although cash-flow was negative in 1990 and 1991, the average over 4 years was not, as will be seen below.[5] Thus, we apply the capitalization rate to net cash-flow to equity rather than net income.

Net income and net cash-flow to equity are calculated in similar ways. Both begin with gross profit from operations, add similar items of income from other sources, and subtract similar expense items. There are several important distinctions, however, evident in a comparison of the calculations of Mr. Frazier and Ms. Eggleston. In his calculation of net income, Mr. Frazier relied on the company's income statements for fiscal years 1987 through 1991 and computed average net income, before reduction for interest and taxes, of $766,259. He subtracted projected amounts for interest of $500,000 and taxes of $90,528, resulting in an earnings base of $175,731. He divided this figure by the capitalization rate of 21.67 percent, to arrive at

_____

[5] As explained below, we use 4-year averages rather than 5-year averages as used by Mr. Frazier and Ms. Eggleston.

an earnings value for all equity holdings in Dunn Equipment of $810,941.

In calculating net income, Mr. Frazier subtracted depreciation, whereas in calculating net cash-flow Ms. Eggleston subtracted actual capital expenditures. Depreciation does not represent actual reductions in cash-flow, but merely reductions for accounting or tax purposes; whereas capital expenditures are actual outlays of available cash and thus actually reduce net cash-flow. Second, in calculating net income Mr. Frazier added the net of profit and loss from the sale of equipment, whereas in calculating net cash-flow Ms. Eggleston added the proceeds from the sale of capital assets. Net cash-flow includes all the proceeds from the sale of assets; the entire proceeds are available to the shareholders, not just the capital gain or loss on such sale. In other words, although basis is relevant for computing capital gain or loss for tax purposes, it is not relevant for purposes of available cash-flow.

Although Ms. Eggleston correctly stated that the proper earnings base was net cash-flow to equity, she failed to include two necessary adjustments, one for long-term debt and another for net working capital. Net working capital, or current assets minus current liabilities, is the amount of cash and other liquid assets needed to operate the business through one business cycle. See generally Bardahl Manufacturing Co. v. Commissioner, T.C.

Memo. 1965-200.  As the need for current assets to operate the business increases, cash available to equity holders decreases; that is, increases to net working capital result in decreases to net cash-flow.  As for long-term debt, as Mr. Pratt pointed out in testimony and in his report, when considering cash-flow to both the equity and debt holders, net changes in long-term debt should not be considered; increases in debt do not increase cash-flow to the debt holders, since they themselves supplied the cash.  However, net changes in long-term debt must be considered when considering cash-flow to equity only, because proceeds received as debt are available as cash-flow to the equity holders.  Respondent argues that there should be no reduction for long-term debt.  However, because the stock in issue represents an equity investment in Dunn Equipment, the proper earnings base will reflect the projected income stream to an equity investment in the company.  Both Mr. Pratt and Ms. Eggleston correctly stated that the relevant earnings base in the instant case is net cash-flow to equity, not to the entire enterprise.  Thus, it is proper to consider net changes in long-term debt.

Finally, there is the question of using a weighted average rather than a straight average to calculate net cash-flow to equity.[6]  Mr. Pratt would have used a weighted average, and,

_____

[6] In a typical 4-year weighted average, the most recent year is given a weight of four, the previous year three, then two,
(continued...)

according to him, a weighted average of net cash-flow was less than the straight average of net income used by Mr. Frazier. It is for this reason that Mr. Pratt believed that Mr. Frazier's use of net income, although technically incorrect, produced acceptable results. However, we think that a weighted average is inappropriate in this case, because of the cyclical nature of the business and the fact that it was in a trough. The weighted average gives too much weight to the lowest point of the cycle. Thus, we use a straight average.

With respect to the 1987 fiscal year, the record does not contain figures for four of the items of net cash-flow to equity; namely, capital expenditures, proceeds from sale of capital assets, changes in net working capital, and changes in long-term debt. Both Mr. Frazier and Ms. Eggleston used averages for 1988 through 1991 (i.e., 4-year averages) for capital expenditures and proceeds from sale of capital assets, while using averages for 1987 through 1991 (i.e., 5-year averages) for every other figure. (Neither Mr. Frazier nor Ms. Eggleston used any figures for net working capital or long-term debt.) We find that it is more accurate to use 4-year averages for all of the figures rather than 5-year averages for some and 4-year averages for others.

---

[6](...continued)
then one, and the total is divided by the sum of the weights, or 10.

Considering the foregoing, we calculate the earnings base of

$286,421 as follows:

| | | |
|---|---|---:|
| Net income from operations | | $830,618 |
| Less: | Interest expense | (493,263) |
| Less: | Income taxes | (114,700) |
| Plus: | Depreciation | 2,078,878 |
| Less: | Capital expenditures | (2,066,057) |
| Plus: | Proceeds from the sale of capital assets | 551,825 |
| Less: | Net profits from the sale of equipment | (453,139) |
| Plus: | Net losses from the sale of equipment | 3,212 |
| Less: | Changes in net working capital | [1]49,200 |
| Plus: | Net changes in long-term debt | [2](100,153) |
| Equals: | Net cash-flow | 286,421 |

[1] According to Mr. Frazier's report, average changes in net working capital totaled -$49,200; subtracting that amount results in the addition of $49,200 to net cash-flow.

[2] Average net changes in long-term debt totaled -$100,153; adding that amount results in the subtraction of $100,153 from net cash-flow.

Dividing the corrected earnings base of $286,421 by the agreed

capitalization rate of 21.67 percent results in an earnings-based

value before discount of $1,321,740.

Respondent also presented additional challenges to

petitioner's earnings value on brief, arguing that petitioner's

expert erred in defining the earnings base by: (i) Failing to

eliminate a bad debt writeoff from its 1989 expenses of $468,000

for Texcrane Rentals, Inc. (Texcrane); and (ii) failing to

reflect the benefits of an investment tax credit carryover of

$767,047 and alternative minimum taxes paid totaling $90,971.

With respect to respondent's first challenge, the Texcrane

bad debt writeoff was treated by Dunn Equipment as an expense

and, in calculating the earnings base, Mr. Frazier accepted this treatment. Respondent argues that the writeoff should be eliminated for purposes of determining value because it represents a one-time noncash charge. In general we agree with respondent's concern, although we have reached respondent's desired result through alternative means. In calculating changes in net working capital, we incorporated the decrease in accounts receivable that resulted from the bad debt writeoff. This caused a decrease in the "changes in net working capital" figure and a concomitant increase in cash-flow (and, ultimately, value). Therefore, we need not eliminate the bad debt writeoff as an expense.

The second challenge made by respondent involves Mr. Frazier's failure to recognize the benefits of certain embedded tax credits when estimating the company's annual income tax liability. As of March 31, 1991, Dunn Equipment had an investment tax credit carryforward of $767,047[7] and an alternative minimum tax credit carryforward of $90,971. Mr. Frazier ascribed no effect to these tax credits and instead applied a straight 34-percent tax rate to his earnings base in computing the company's expected annual income tax cost. On brief, respondent argues that the 34-percent tax rate applied by

[7] This figure represents the carryforward general business credit for the year ending March 31, 1991, of $773,559, less the credit used for such year of $6,512, leaving $767,047.

Mr. Frazier fails to take into account these credits and that the estimated annual income tax liability of the company should be reduced by the net present value of these credits. We agree with petitioner that a potential buyer would place no value on the embedded tax credits and that a 34-percent tax rate on net income is appropriate.

Because of the nature of its business, Dunn Equipment holds a large number of depreciable assets. These assets, and the large depreciation deductions they generated, required the company to pay alternative minimum taxes for taxable years 1988 through 1991. See secs. 55(a) and (b)(1) and 56(a)(1). There is no indication that decedent's death would alter Dunn Equipment's business, in particular that alternative minimum tax payments would no longer be made. Indeed, given the nature of its business, it is clear that Dunn Equipment will continue to be liable for alternative minimum taxes for the foreseeable future.

It is because Dunn Equipment will continue to pay alternative minimum tax that the hypothetical buyer and seller would place no value on the embedded tax credits. Section 55(a) defines the alternative minimum tax as the excess, if any, of the "tentative minimum tax" over the "regular tax". Sec. 55(b) and (c). Under section 38(c), the investment tax credit is available only if the company's "net income tax" exceeds its tentative minimum tax. Net income tax means the sum of the regular tax and

the alternative minimum tax, reduced by certain credits. Net income tax exceeds the tentative minimum tax only in years when there is no alternative minimum tax. Thus, the effect of section 38(c) is to limit the use of the investment tax credit to taxable years for which the company is not liable for alternative minimum taxes. Likewise, under section 53(c), the alternative minimum tax credit is available only to the extent that the company's regular tax liability (reduced by certain allowable credits) exceeds its tentative minimum tax, which only occurs when there is no alternative minimum tax. Thus, section 53(c) also limits the use of the alternative minimum tax credit to taxable years for which the company is not liable for alternative minimum taxes. Accordingly, we find that the hypothetical buyer and seller would not consider the credits in valuing Dunn Equipment.[8]

B. Asset-Based Value

The parties agree that the underlying asset values used by Mr. Frazier are in accordance with Dunn Equipment's balance sheet of May 1991. However, as noted above, in calculating net asset value, Mr. Frazier calculated what he considered liquidation value. On this basis, he assigned no value to two prepaid accounts listed on the balance sheet. Further, he reduced his

_____

[8] Respondent also argues that the investment and alternative minimum tax credits should affect Dunn Equipment's asset-based value. For the reasons stated above, we reject this argument.

value by 34 percent of Dunn Equipment's built-in capital gains.[9]
Respondent challenges both of these positions.

In calculating net asset value, Mr. Frazier adjusted the underlying asset values shown on the balance sheet of Dunn Equipment as follows:  (i) By allocating no value to prepaid expenses of $52,643 and prepaid interest of $671,260 and (ii) by reducing total asset value by 34 percent of Dunn Equipment's built-in capital gains on underlying assets to account for potential capital gains tax liability.[10]  Mr. Frazier's estimated net asset value for the entire company, before any reduction for potential tax liability, was $7,519,439.  Further, he calculated the built-in capital gains in Dunn Equipment's assets to be $7,109,000.

There is no question that the prepaid expenses and interest would be valuable to the buyer of Dunn Equipment who intended to continue to operate the company.  In such a case, as the expenses and interest came due, the company would not be required to make

---

[9] Dunn Equipment owned property as well as equipment.  It appears that the proceeds from the sale of the equipment would have resulted in ordinary income rather than capital gains.  See sec. 1245.  None of the parties or their experts addressed this point.  However, Mr. Frazier used a 34-percent rate for both ordinary income and capital gains, which appears to be the correct result under secs. 11 and 1201.  Thus, for our purposes it is irrelevant whether the proceeds resulted in ordinary or capital gain.

[10] Respondent also challenges petitioner's failure to include the value of a $35,000 townhouse in asset value.  Petitioner concedes this point.

any outlays of cash.  But Mr. Frazier's calculation of asset-based value assumed liquidation.  He argued that the prepaid accounts had no value to the buyer who intended to liquidate because they could not be sold and they could not be used to offset costs of the operating company (since liquidation was intended).  We find several difficulties with Mr. Frazier's approach.  First, Mr. Frazier himself suggested that, depending on the agreements with lenders, Dunn Equipment might be able to receive prepaid interest back from the lenders if it was able to pay off the principal of the loans during liquidation.  Second, in assigning no value to the prepaid accounts, Mr. Frazier apparently assumed that liquidation would take place almost instantaneously.  Even if the buyer intended to liquidate, the prepaid accounts would still have some value to the buyer because liquidation could not be accomplished instantaneously and the company would continue to operate for a time, utilizing the prepaid accounts to offset liabilities that came due.  Finally, and most important, given that the number of shares of stock in issue was not large enough to cause liquidation, and that other shareholders were unlikely to agree to liquidation, we think the chance of liquidation was sufficiently small (although not nonexistent) that the hypothetical buyer and seller would not reduce the value of the prepaid accounts in considering an asset-based value of the company.

Respondent also challenges Mr. Frazier's reduction in net asset value for potential tax liability on built-in capital gains. Mr. Frazier reduced his asset-based value by 34 percent of the built-in capital gain, again on the assumption that he was calculating a liquidation value. Respondent argues that no reduction is proper because liquidation was not imminent. In Estate of Davis v. Commissioner, 110 T.C. 530, 550 (1998), we applied a reduction for inherent gain "even though no liquidation * * * was planned or contemplated on the valuation date". However, there are significant distinctions between that case and the instant case. In Estate of Davis, the company in question was essentially a holding company, and the primary asset it held was a block of publicly traded stock with substantial built-in capital gain.[11] Because the hypothetical buyer of the shares in issue in that case could buy the same publicly traded stock on the open market without the exposure to capital gains tax, we found that "there was even less of a ready market" in the shares in issue "than there would have been * * * without such tax." Id. at 553. Thus, we included, within the discount for lack of marketability, a reduction with respect to the inherent capital gains of approximately 15 percent. See id. at 554.

---

[11] The fair market value of the stock was $70,043,204, while the company's basis in that stock was $338,283. See Estate of Davis v. Commissioner, 110 T.C. 530, 533 (1998). The company owned other assets worth $11,929,763 and had liabilities of $1,832,698. See id.

In the instant case, the primary assets in question are equipment, not publicly traded stock (although Dunn Equipment also had some real estate). In using a 34-percent reduction, Mr. Frazier failed to consider that the hypothetical buyer who did not wish to continue operating the company, and who was able to convince additional shareholders to form a super-majority, had other options besides liquidation. A new owner who wished to change the business of the company into, for example, construction rather than equipment rental, would not have a need to buy new equipment every few years, and could use the equipment the company owned for its entire useful life, eliminating the realization of built-in gain. This goal could also be accomplished by forming a new corporation engaged in the construction business; sections 351 and 361 would permit Dunn Equipment to transfer equipment to the new corporation in exchange for its stock, without recognition of gain on the transfer. Only if the buyer intended to liquidate in the short term would that buyer seek a substantial reduction for built-in capital gain. We believe that there is some chance that the hypothetical buyer would have purchased the stock in issue with the intent to liquidate, although, as we have explained, the likelihood of liquidation was rather low. Nonetheless, we believe that the presence of built-in gain would reduce the

asset-based value of the stock in question to some extent.[12]
Considering all the facts and circumstances, we think that a
reduction in the amount of 5 percent of the built-in gains is
appropriate.

In light of the foregoing, we find that the net asset value
of Dunn Equipment is equal to the asset value calculated under
Mr. Frazier's report ($7,519,439) plus the value of the townhouse
($35,000) and the amounts recorded as prepaid expenses ($52,643)
and prepaid interest ($671,260), reduced by 5 percent of the
amount of the built in gain of $7,109,000 ($355,450), resulting
in a prediscount asset-based value for the entire company of
$7,922,892.

C.  Combining the Values

As previously discussed, we have decided that the fair
market value of decedent's stockholdings is best approximated by
an allocation of 65 percent to the asset-based value of
$7,922,892 and 35 percent to the earnings-based value of
$1,321,740, resulting in an overall value of $5,612,489.  Based
upon these findings, the fair market value of decedent's 62.96-

---

[12] The effect of any inherent gain on the hypothetical buyer
who wishes merely to continue operating the company has been
taken into account in the earnings-based value discussed above,
because the company sold equipment as part of its ongoing
operations.  Thus, we apply the reduction to the asset-based
value only, rather than as part of an overall discount to the
asset- and earnings-based values.

percent interest in Dunn Equipment, before application of appropriate discounts, is $3,533,623.

## III.  Discounts

The parties agree that a 15-percent lack of marketability discount is appropriate.[13]  Further, respondent concedes that a 7.5-percent discount for lack of super-majority control, i.e., for the fact that the stock in issue is less than 66-2/3 percent, is also appropriate.  Petitioner argues on brief for a 10-percent discount for lack of super-majority control.  Neither Mr. Frazier nor Mr. Pratt provided support for a discount for lack of super-majority control, and petitioner offers no evidence supporting a discount greater than 7.5 percent.  We apply a discount of 7.5 percent for lack of super-majority control.  Therefore the discounts, in total, equal 22.5 percent.

## IV.  Conclusion

We have calculated an undiscounted value of petitioner's 62.96-percent interest in Dunn Equipment on the date of decedent's death of $3,533,623.  Applying a 22.5-percent discount to this figure, we find that the fair market value of the stock in issue for purposes of the Federal estate tax is $2,738,558.

---

[13] On brief, respondent agreed that the lack of marketability discount could properly be applied to the earnings-based value.  Further, respondent agreed that the lack of marketability discount could properly be applied to an asset-based value generally but argued that it should not be applied to liquidation value.  As we have not used liquidation value, we need not address respondent's argument.

To reflect the foregoing,

Decision will be entered

under Rule 155.