# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

_____

## No. 00-60614
_____

BEATRICE ELLEN JONES DUNN, Deceased, ESTATE
OF, JESSE L. DUNN III, Independent Executor,

                                     Petitioner-Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE,

                                     Respondent-Appellee.

_____

Appeal from the Decision of the
United States Tax Court

_____

August 1, 2002

Before SMITH, DUHÉ, and WIENER, Circuit Judges.

WIENER, Circuit Judge.

The sole issue presented by this appeal from the United States Tax Court (the "Tax Court") is the fair market value of a block of common stock in Dunn Equipment, Inc. ("Dunn Equipment" or the "Corporation") owned by the late Beatrice Ellen Jones Dunn (the "Decedent") on the date of her death (the "valuation date") for purposes of calculating the estate tax owed by Petitioner-Appellant Estate of Beatrice Ellen Jones Dunn, Deceased (the "Estate"). The Tax Court valued the Decedent's shares higher than had the Estate on the Form 706 (the "estate tax return" or the "return") filed by

Jesse L. Dunn III, the Decedent's Independent Executor (the "Executor") but lower than had Respondent-Appellee Commissioner of Internal Revenue (the "Commissioner"). We conclude that the Tax Court erred as a matter of law in the valuation methodology that it selected and applied to facts that are now largely uncontested by virtue of stipulations, concessions, and non-erroneous findings of that court. This legal error produced an incorrect valuation and thus an erroneous final Tax Court judgment as to the Estate's tax deficiency, requiring remand to that court.

We hold that the correct methodology for determining the value of Dunn Equipment as of the valuation date requires application of an 85:15 ratio, assigning a weight of 85% to the value of the Corporation that the Tax Court determined to be $1,321,740[1] when using its "earnings-based approach" and a weight of 15% to the value that the court determines on remand using its "asset-based approach" but only after recomputing the Corporation's value under this latter approach by reducing the market value of the assets[2] by 34% of their built-in taxable gain — not by the 5% as previously applied by that court — of the built-in gain (excess of net sales value before taxes over book value) of the assets, to account for the inherent gains tax liability of the assets.

---

[1] If need be, this figure can be fine tuned on remand to reconcile the slight discrepancy between the Tax Court's figure and that of the Estate.

[2] $8,278,342 according to the Tax Court; $8,268,345 according to the Commissioner's appellate brief.

2

We therefore remand this case to the Tax Court for it to (1) redetermine the asset-based value using a 34% reduction for built-in tax liability; (2) recalculate the fair market value of the Corporation based on that 85:15 weighting ratio; (3) calculate the value of the Estate's ratable portion of the total value of the Corporation as thus redetermined; (4) discount the value of that ratable portion by 22.5% for lack of market and lack of super-majority; (5) based on that result, redetermine the estate tax liability of the Estate as well as any resulting overpayment of such taxes by the Estate; and (6) render a final judgment consistent with this opinion and our judgment.

I. Facts and Proceedings

A.   Proceedings

In November, 1994, approximately three and one-half years after the Decedent's death and two and one-half years after her estate tax return was filed, the Commissioner issued a notice of deficiency, assessing additional estate taxes of $238,515.05. This litigation ensued.  In an amended answer filed in the Tax Court, the Commissioner increased the asserted estate tax deficiency to approximately $1,100,000.  This deficiency was predicated on the Commissioner's contention that the Decedent's 492,610 shares of common stock in Dunn Equipment, a closely-held, family-operated corporation, was undervalued in the estate tax return.  The Commissioner argued that such stock should be valued solely on the basis of the fair market value of its assets, discounted only for

3

lack of a market and lack of a super-majority, and with no reduction for built-in tax liability of those assets and no consideration whatsoever of an earnings or cash flow-based approach to valuation.

In June, 1996, trial was held in the Tax Court to determine the fair market value of Decedent's block of stock in Dunn Equipment. Approximately three and one-half years after trial, the Tax Court issued its Memorandum Findings of Fact and Opinion ("the Tax Court opinion"). The court concluded that the subject block of stock, which constituted 62.96% of the issued and the outstanding shares of Dunn Equipment's capital stock, was worth $2,738,558 on the valuation date. After the Tax Court entered its final judgment some six months later, the Estate timely filed a notice of appeal.

B.  Facts

Based in principal part on stipulations, uncontested evidence,[3] and concessions, the Tax Court found the following facts. Decedent, a longtime resident of Texas, died there on June 8, 1991 at the age of 81. The Executor, Decedent's son, is also a Texas resident, and the Estate was administered there.

---

[3] We do not refer here to the testimony and documents submitted by the opposing parties' dueling experts as being uncontested. The Commissioner contested the methodology of the Estate's expert appraisers, and the Estate took issue with the assertions of the Commissioner's accounting (not appraisal) expert; but the Tax Court was not required to credit such testimony and in fact disregarded or disagreed with much of it from both camps. Like the Tax Court, we are not bound to rely on expert testimony proffered by the Estate or the Commissioner.

Dunn Equipment was incorporated in Texas in 1949. It had been family owned and operated throughout its entire existence. The Corporation actively operated its business from four locations in Texas and, on the valuation date, employed 134 persons, three of whom were executives and eight of whom were salesmen.

Dunn Equipment owned and rented out heavy equipment, and provided related services, primarily in the petroleum refinery and petrochemical industries. The personal property rented from the Corporation by its customers consisted principally of large cranes, air compressors, backhoes, manlifts, and sanders and grinders. The Corporation frequently furnished operators for the equipment that it rented to its customers, charging for both equipment and operators on an hourly basis. For example, the Corporation's revenues resulted in significant part from the renting of large cranes, with and without operators. For the four fiscal years preceding the valuation date, equipment rented with operators furnished by the Corporation produced between 26.3% and 32.7% of the Corporation's revenues. On the valuation date, Dunn Equipment's assets comprised the aforedescribed heavy equipment, plus industrial real estate valued at $1,442,580 and a townhouse valued at $35,000, prepaid expenses of $52,643, and prepaid interest of $671,260.

In addition to the shares owned by the Decedent, shares in Dunn Equipment constituting 31.12% of the issued and outstanding common stock were owned individually by Jesse L. Dunn III (the

5

Decedent's son and executor), who also held title to an additional 2.61% as a trustee. Shares representing the remaining 3.31% of the Corporation's issued and outstanding stock were owned in combination by other family members and employees of the Corporation.

The Corporation's Board of Directors consisted of the Decedent; her son and executor, Jesse; and her grandson, Peter Dunn (Jesse's son). Jesse was President, Peter was Vice President, and the Decedent was Secretary-Treasurer. The Tax Court found that compensation paid to the officers of Dunn Equipment was lower than that paid to officers of similarly situated companies.

Over the course of its 42 years of operation preceding the valuation date, Dunn Equipment had emerged as the largest heavy equipment rental business in its part of Texas, holding a substantial share of that market. By virtue of its market dominance and reputation for dependable service, the Corporation was historically able to command rates above the market average. From 1987 through the valuation date, a decline in the worldwide price of feed stock for the oil refining and petrochemical industries created a favorable business climate for the Corporation's principal customers, and Dunn Equipment's gross revenues increased during that period.

During the same period, however, the heavy equipment rental market became increasingly competitive, as equipment such as cranes became more readily available and additional rental companies

6

entered the field. This in turn caused hourly rental rates to decline and flatten. In fact, increased competition prevented Dunn Equipment from raising its rental rates at any time during the period of more than ten years preceding the valuation date. These rates remained essentially flat for that 10-year period. The same competitive factors forced the Corporation to replace its equipment with increasing frequency, reaching an average new equipment expenditure of $2 million per annum in the years immediately preceding the valuation date.

In addition to the increased annual cost and frequency of replacing equipment during the years of flat rental rates that preceded the Decedent's death, the Corporation's operating expenses increased significantly, beginning in 1988, and continued to do so thereafter: The ratios of direct operating expenses to revenue escalated from 42% in 1988 to 52% in the 12-month period that ended a week before the Decedent's death. The effect of the increase in direct operating expenses on the Corporation's cash flow and profitability was exacerbated by a practice that Dunn Equipment was forced to implement in 1988: meeting its customers' demands by leasing equipment from third parties and renting it out to the Corporation's customers whenever all of its own equipment was rented out to other customers. Although this practice, which continued through the valuation date, helped Dunn Equipment keep its customers happy and retain its customer base, the Corporation

7

was only able to break even on these re-rentals, further depressing its profit margin.

Based on the foregoing factors, the Tax Court concluded that the Corporation had no capacity to pay dividends during the five years preceding the death of the Decedent. In fact, it had paid none.

As of the valuation date, no public market in the stock of Dunn Equipment existed, and no recent private transactions in its stock had occurred. There was no current or pending litigation that could have had a material effect on the value of the stock, but large annual capital expenditures for equipment replacement coupled with shrinking profit margins resulting from the combination of increased operating expenses and flat or reduced rental rates, essentially eliminated net cash flow available for debt reduction or dividend payment. On the valuation date, the Corporation had outstanding debt of $7,343,161, producing a debt-to-equity ratio in excess of 6.5 to 1. The Corporation's average net annual cash flow for the 4-year period ending with the valuation date was only $286,421. Given the Tax Court's finding regarding the underpayment of compensation to its officers, the Corporation's cash flow — and thus its income-based valuation — is actually overstated.

On the basis of these extensive factual findings and reasonable inferences from them, the Tax Court concluded that, as of the valuation date, Dunn Equipment was "a viable operating

8

company...and earned a significant part of its revenues from selling services as well as renting equipment"; that between one-fourth and one-third of the Corporation's gross operating revenue was produced by charges for labor, parts, and equipment rentals with operators supplied; and that there were "significant active operational aspects to the company as of the valuation date."[4]

The Tax Court also found that, even though the Decedent's 62.96% of stock ownership in the Corporation gave her operational control, under Texas law she lacked the power to compel a liquidation, a sale of all or substantially all of its assets, or a merger or consolidation, for each of which a "super-majority" equal to or greater than 66.67% of the outstanding shares is required.[5] The Court further concluded that, in addition to lacking a super-majority herself, the Decedent would not have been likely to garner the votes of additional shareholders sufficient to constitute the super-majority required to instigate liquidation or sale of all assets because the other shareholders were determined to continue the Corporation's independent existence and its operations indefinitely. The court based these findings on evidence of the Corporation's history, community ties, and

---

[4] Dunn v. Comm'r, 79 T.C.M. (CCH) 1337, 1339 (2000).

[5] Id. at 1340 (citing TEX. BUS. CORP. ACT ANN. art 6.03 (West 1991)).

relationship with its 134 employees, whose livelihoods depended on Dunn Equipment's continuing as an operating business.[6]

We perceive no clear error in any of the foregoing findings or in the inferences and conclusions that the Tax Court derived from them.

The Tax Court found further that, for Dunn Equipment, the process of liquidation would be expensive and time-consuming, involving sales costs, transportation costs, reduced equipment sales prices because of the increased short-term supply of such equipment that would result from a liquidation's flooding of the market, and the risk of loss of customers during the course of a lengthy liquidating process if that were to be attempted. These findings too are free of clear error. (Again, the Court did not list among Dunn Equipment's costs of liquidation, however, the adverse tax results that would be incurred, particularly the 34% federal income tax on gains to be realized by the Corporation on the sale of its equipment, whether ultimately deemed ordinary income or capital gains.[7])

---

[6] Although not mentioned by the court, we speculate that the specter of incurring a 34% tax on the multimillion dollar amount by which the selling price of the assets in liquidation would have exceeded the Corporation's basis for tax purposes was also a deterrent to liquidation.

[7] The taxable gain on any sale of used heavy equipment presumably would result from reduction in basis produced by substantial depreciation deductions previously taken, not from appreciation in value of these assets, as age, use, and obsolescence generally produce sales prices for such used equipment substantially below its original cost.

Having painted this clear and detailed valuation-date portrait of Dunn Equipment, the Tax Court proceeded to confect its valuation methodology. The court selected two different approaches to value, one being an income-based approach driven by net cash flow[8] and the other being an asset-based approach driven by the net fair market value of the Corporation's assets.[9] The court calculated the Corporation's "earnings-based value" at $1,321,740 and its net "asset-based value" at $7,922,892, as of the valuation date. The latter value was calculated using a 5% factor for built-in gains tax liability, not the actual rate of 34% that the Corporation would have incurred on sale to a willing buyer.

As the next step in its methodology, the Tax Court assigned dissimilar weights to the two valuations, expressly rejecting (1) the Estate's expert's method, which assigned equal weight to each, and (2) the Commissioner's contention that no weight whatsoever should be given to earnings or cash flow and that the Corporation

---

[8] The Estate's expert proffered the use of a capitalization-of-earnings rather than a capitalization-of-net-cash-flow approach to an earnings-based valuation, but the results of these two methods produced similar results, and the Estate does not press the issue on appeal.

[9] We note in passing that the court did not include dividend-paying capacity as a factor despite its customary inclusion in multifaceted valuation methodology for closely held corporations. See, e.g., Rev. Rul. 59-60, 1959-1 C.B. 237, § 4.01(e) (1959). Although factoring in a "zero" dividend-paying capacity would have further reduced the value of Dunn Equipment, the Estate has not complained to us of that omission so we do not examine it as a possible error in the valuation methodology employed by the Tax Court.

11

be valued entirely on asset value undiminished by any built-in tax liability.  Despite having concluded that "the hypothetical investor would give earnings value substantial weight" and acknowledging "that, as a general rule, earnings are a better criterion of value for operating companies [which Dunn Equipment is] and net assets a better criterion of value for holding or investment companies [which Dunn Equipment is not],"[10] the Tax Court confected the weighting factor of its valuation method by assigning a weight of 35% to earnings-based value and 65% to asset-based value (which the court calculated by, inter alia, reducing the value of assets by 5% for built-in gains tax liability).[11]  After applying its weighted average to the results of its two valuation approaches to reach the fair market value of the entire Corporation, the Tax Court calculated the Decedent's percentage of ownership (62.96%) to ascertain the pro rata value of her block of stock.

The final step in the Tax Court's methodology involved the determination and application of discounts.  In the discount step, the court concluded that the gross pro rata value of Decedent's block of stock should be reduced 15% for lack of marketability and

_____

[10] Dunn, 79 T.C.M. (CCH) at 1340.

[11] For over 40 years, Rev. Rul. 59-60 has counseled against assigning finite percentages to relative weights of the various valuation methods employed by appraisers of stock in closely held businesses; yet that admonition is largely honored in its breach — as exemplified by both the Tax Court and the Estate's appraiser in this case.

12

7.5% for lack of super-majority control, producing a total discount of 22.5%. This is not contested on appeal.

The Executor had returned the Decedent's block of stock at $1,635,465. The Estate's expert appraiser's 50:50 weighting approach produced a minimally lower value of $1,582,185. The Commissioner originally contended that the value was $2,229,043 but ultimately claimed the value to be $4,430,238. And the Tax Court found the value to be $2,738,558.

On appeal, the Estate has stipulated that it is not contesting the Tax Court's determination of the value of Dunn Equipment "under the earnings based approach, or [the Tax Court's] application of a 15% discount for lack of marketability and a 7.5% discount for lack of super-majority control" to the Decedent's pro rata ownership of the issued and outstanding stock of the Corporation.[12] This reduces our chore to one of reviewing only the aspects of the Tax Court's methodology that the Estate does continue to challenge, i.e., the method employed to determine (1) the appropriate discount to apply to the value of the Corporation's assets to account for built-in tax liability in determining its asset-based value and (2) the relative weights to assign to the two disparate values, income-based and asset-based.

## II. Analysis

---

[12] Neither has the Estate contested the Tax Court's finding of the market value of the Corporation's assets, before discount for built-in tax liability, of $8,278,342.

13

A.   Standard of Review

We review opinions and judgments of the Tax Court under the same standards that we apply when reviewing those of other trial courts:  Factual determinations are reviewed for clear error, and conclusions of law are reviewed de novo.[13]  We have held that determination of fair market value is a mixed question of fact and law for which "the factual premises [are] subject to review on a clearly erroneous standard, and the legal conclusion[s are] subject to de novo review."[14]  The mathematical computation of fair market value is an issue of fact, but determination of the appropriate valuation method is an issue of law that we review de novo.[15]

B.   Burden of Proof

On the estate tax return, the Decedent's block of stock in Dunn Equipment was valued at $1,635,465.  The Commissioner's deficiency notice stated a value of $2,229,043.  Subsequently, the Commissioner's amended answer upped the value to $4,430,238, roughly doubling the deficiency notice value and increasing the asserted estate tax deficiency by $861,485 for a total of

---

[13] See, e.g., McIngvaIe v. Comm'r, 936 F.2d 833, 836 (5th Cir. 1991).

[14] In re T-H New Orleans, Ltd. P'ship, 116 F.3d 790, 799 (5th Cir. 1997).

[15] Estate of Palmer v. Comm'r, 839 F.2d 420, 423 (8th Cir. 1988)(citing Powers v. Comm'r, 312 U.S. 259, 260 (1941))("The ultimate determination of fair market value is a finding of fact. ...  The question of what criteria should be used to determine value is a question of law subject to de novo review.").

14

$1,100,000. The Tax Court correctly observed that the Estate has the burden of refuting the value asserted in the Commissioner's original notice of deficiency, but that the Commissioner has the burden of proving any value in excess of that initial amount.[16]

C.  The Commissioner's Disparate Positions:  Trial Vis-à-Vis Appeal

1.  Position On Appeal

As appellee, the Commissioner supports the Tax Court's treatment of each aspect of the case and asks us to affirm the court's judgment.  Specifically, the Commissioner urges us to accept, inter alia, the Tax Court's dual approach to value; the court's treatment of built-in tax liability; the relative weights assigned by the court to the results of each approach; and the court's discounts for lack of market and lack of supermajority control.

2.  Pre-Trial and Trial Position

The Commissioner's posture on appeal is a stark departure from his pre-trial and trial position:  amending his answer to quadruple the Estate's tax deficiency as originally assessed, urging the Tax Court to disregard totally the built-in tax liability of the Corporation's assets, insisting that the Corporation be valued solely on asset values, and urging that no consideration whatsoever be given the earnings or cash-flow based approach to valuation. Indeed, at trial, the Commissioner did not favor the Tax Court with

---

[16] See Dunn, 79 T.C.M. (CCH) at 1338.

testimony of an expert appraiser, even though the Commissioner had affirmatively proposed his own, geometrically higher value for the Decedent's block of stock — values that started out higher than the ones reported on the estate tax return and that were then multiplied, by virtue of the Commissioner's amended answer, to almost four times the Estate's figures. Yet, instead of supporting his own higher values (for which he had the burden of proof) by proffering professional expert valuation testimony during the trial, the Commissioner merely engaged in guerilla warfare, presenting only an accounting expert to snipe at the methodology of the Estate's valuation expert. The use of such trial tactics might be legitimate when merely contesting values proposed by the party opposite, but they can never suffice as support for a higher value affirmatively asserted by the party employing such a trial strategy. This is particularly true when, as here, that party is the Commissioner, who has the burden of proving the expanded value asserted in his amended answer.

Using such tactics remains the prerogative of the Commissioner and his trial counsel, at least up to a point. But when his choice of tactics is viewed in the framework of the substantive valuation methodology urged by the Commissioner in the Tax Court, his posture at trial is seen to be so extreme and so far removed from reality as to be totally lacking in probative value.

To keep this in perspective, it must be remembered that this case had been under the scrutiny of the Commissioner for many years

16

before trial, during which time he had to have learned essentially all of the discrete attributes of Dunn Equipment that were eventually stipulated by the parties or found by the Tax Court: its operating history, its sources of income, the nature of its assets and their use in its operations, the status of the industry, and so on ad infinitum. Thus, as of the commencement of trial, the Commissioner must be held to the knowledge that Dunn Equipment was and had always been, as the Tax Court concluded, "a viable operating company" which "earned a significant part of its revenues from selling services as well as renting equipment" and that there were "significant active operational aspects to the company as of the valuation date."[17] When the nature of the Corporation's assets ⸺ primarily heavy equipment held not for investment or production of passive income, like interest and dividends, but for active hourly rental (frequently with operators furnished by the Corporation), in the heavy construction and maintenance of chemical plants and petroleum refineries, rapidly depreciating with use and requiring constant maintenance, repair, and replacement ⸺ are viewed in pari materia with the myriad specific attributes of the Corporation, the untenability of the Commissioner's trial position in the Tax Court is plain.

Consequently, the Commissioner's insistence at trial that the value of the subject stock in Dunn Equipment be determined

---

[17] Dunn, 79 T.C.M. (CCH) at 1339.

17

exclusively on the basis of the market value of its assets, undiminished by their inherent tax liability — coupled with his failure to adduce affirmative testimony of a valuation expert — was so incongruous as to call his motivation into question. It can only be seen as one aimed at achieving maximum revenue at any cost, here seeking to gain leverage against the taxpayer in the hope of garnering a split-the-difference settlement — or, failing that, then a compromise judgment — somewhere between the value returned by the taxpayer (which, by virtue of the Commissioner's eleventh-hour deficiency notice, could not effectively be revised downward) and the unsupportedly excessive value eventually proposed by the Commissioner. And, that is precisely the result that the Commissioner obtained in the Tax Court.

Any remaining doubt that the Commissioner's pretrial and trial tactics in this case could conceivably evidence a bona fide disagreement over the value of Dunn Equipment is dispelled by the element of timing. In an estate tax situation, the statute of limitations for assessment and collection by the IRS is generally three years, as specified in Internal Revenue Code ("I.R.C.") § 6501. When the IRS presents a deficiency notice in close proximity to the expiration of I.R.C. § 6501's 3-year time bar, it creates a tactical advantage for itself: Once the statute of limitation expires, the taxpayer can no longer claim a refund even if he then concludes that he was too conservative in his original valuation. This is so because the ability of the taxpayer to claim a refund is

18

controlled by I.R.C. § 6511, which provides that the taxpayer has until the later of three years from the time the return was filed or two years from the time the tax was paid to assert such a claim. The tax due is normally paid with the tax return, by or before the due date. As a result, the only amount that the taxpayer could recover would be for taxes paid in response to the deficiency notice. Consequently, by holding off the filing of a notice of deficiency until more than two years following payment of tax or three years following the filing of the return, the IRS is able to manufacture an advantage with no downside risk: The taxpayer is precluded from claiming a refund except for any taxes paid with the deficiency notice, and the Commissioner is able to assert an excessive value and then use it for leverage in negotiations or at trial.

The Commissioner's abrupt change of position on appeal is so inconsistent and unreconcilable with his pretrial and trial positions that all of his urgings to us are rendered highly suspect. We keep this duplicity in mind as we proceed to examine the Tax Court's valuation methodology.

D. Determination of Fair Market Value

The definition of fair market value is as universally recognized as its determination is elusive: Fair market value is "'the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge

19

of relevant facts.'"[18] As a broad generality, appraising corporations or blocks of corporate stock involves consideration of three approaches: income, market, and assets-based.[19] When, as here, the corporation being appraised is closely held, is not regularly traded on an exchange, has not been traded at arm's length in close proximity of the valuation date, and is not comparable to other corporations engaged in the same or similar businesses of which there is evidence of recent sales of stock, the market approach is inapposite, leaving only the income and assets-based approaches as candidates for analysis. Thus, in cases like this, such features as net worth, prospective earning power and dividend-paying capacity, good will, position in the industry, management, economic outlook of the industry, and the degree of control represented by the block of stock in question must be looked to in the appraisal process.[20]

As is apparent from the essentially uncontested operative facts and inferences of this case, most of the heavy lifting required to reach the ultimate conclusion of fair market value of Decedent's block of stock had been accomplished by the time the

---

[18]  United States v. Cartwright, 411 U.S. 546, 551 (1973)(quoting Treas. Reg. § 20.2031-1(b)).

[19] See SHANNON P. PRATT ET AL., VALUING A BUSINESS: THE ANALYSIS AND APPRAISAL OF CLOSELY HELD COMPANIES 45 (4th ed. 2000) [hereinafter VALUING A BUSINESS].

[20] See Treas. Reg. § 20.2031-2(f); see also Rev. Rul. 59-60, 1959-1 C.B. 237, § 4.01.

question reached us.  In addition, most of the penultimate conclusions regarding valuation methodology are conceded or uncontested on appeal:  the pre-discount value of the Corporation under the earnings-based approach ($1,321,740); its debts ($7,343,161); the market value of its assets before adjustment for built-in tax liability ($8,278,342); the discount for lack of marketability (15%); and the discount for lack of super-majority control (7.5%).  That is why only two contested questions remain, both of which implicate valuation methodology:  Did the Tax Court err as a matter of law in the methodology that it chose for (1) dealing with the assets' built-in tax liability when determining the Corporation's asset-based value, and (2) assigning relative weights to the asset-based and earnings-based values?  The parties to this appeal agree with the Tax Court's starting point that "[t]he dispute in the instant case concerns the proper <u>method</u> for valuing an interest in a company in which asset-based value and earnings-based value are widely divergent."[21]  We therefore begin by examining <u>de</u> <u>novo</u> the method employed by the Tax Court for dealing with the built-in tax liability of assets in connection with the asset-based approach to value.  We then review <u>de</u> <u>novo</u> the method employed by the court in determining the relative weights to be given to Dunn Equipment's "widely divergent" asset-based and earnings-based values.

---

[21] <u>Dunn</u>, 79 T.C.M. (CCH) at 1338 (emphasis added).

1.    Adjustment for Built-In Tax Liability of Assets

None can dispute that if Dunn Equipment had sold all of its heavy equipment, industrial real estate, and townhouse on the valuation date, the Corporation would have incurred a 34% federal tax on the gain realized, regardless of whether that gain were labeled as capital gain or ordinary income.[22]  The question, then, is not the rate of the built-in tax liability of the assets or the dollar amount of the inherent gain, but the method to employ in accounting for that inherent tax liability when valuing the Corporation's assets (not to be confused with the ultimate task of valuing its stock).

The Estate's expert took the position that, when determining the asset-based value to be used in calculating the fair market value of the Corporation, its assets must be treated as though they had in fact been sold, in which event the Corporation would have incurred federal income tax equal to 34% of the gain realized on the sale.   This in turn would have instantly reduced the Corporation's fair market value, dollar for dollar, for taxes payable.  But, if the willing buyer were to purchase the Decedent's block of stock with the assets still owned by the Corporation, then regardless of whether thereafter that buyer could and would cause all or essentially all of the Corporation's assets to be sold, either in the ordinary course of business or globally in

---

[22] Id. at 1344, n.9 (referring in its analysis to I.R.C. §§ 1245, 11, and 1201).

22

liquidation, the value to the Corporation of its assets qua assets would still be the amount that the Corporation could realize on disposition of those assets, net of all costs (including gains tax). The Estate contends that, like advertising and transportation costs, commissions, and other unavoidable expenses of disposition of these assets accepted by the Tax Court, the assets' gross value must be reduced by their built-in gains tax liability to reach their net fair market value for purposes of calculating the asset-based value of the Corporation.

In diametric opposition, the Commissioner argued to the Tax Court that no reduction for built-in tax liability should be allowed. He grounded this contention solely on the assertion that liquidation was not imminent or even likely.

Although the Tax Court accepted the 34% rate and acknowledged that the value of the Corporation had to be reduced by some factor to account for inherent tax liability of its assets, the court followed the Commissioner's "no imminent liquidation" red herring and concluded that only if the hypothetical willing buyer of the Decedent's block of stock intended to liquidate the Corporation in the short term —— which the holder of that block of stock, acting alone, could not force —— would that buyer seek a substantial reduction for built-in capital gain. The Tax Court then proceeded to discuss such a postulational buyer's alternatives to liquidation and to calculate the present value (actually, negative value) of future tax liability. The court concluded that the asset-based

23

value of Dunn Equipment should be reduced by only 5% for potential tax costs, not by the full 34% gains tax that the Corporation would have to pay when and if its assets were sold, whether in globo or seriatim.

The Tax Court's fundamental error in this regard is reflected in its statement that —— for purposes of an asset-based analysis of corporate value —— a fully-informed willing buyer of <u>corporate shares</u> (as distinguished from the Corporation's assemblage of assets) constituting an operational-control majority would <u>not</u> seek a substantial price reduction for built-in tax liability, absent that buyer's intention to liquidate. This is simply wrong: It is inconceivable that, since the abolition of the <u>General Utilities</u> doctrine and the attendant repeal of relevant I.R.C. sections, such as §§ 333 and 337, any reasonably informed, fully taxable buyer (1) of an operational-control majority block of stock in a corporation (2) <u>for the purpose of acquiring its assets</u>, has not insisted that all (or essentially all) of the latent tax liability of assets held in corporate solution be reflected in the purchase price of such stock.

We are satisfied that the hypothetical willing buyer of the Decedent's block of Dunn Equipment stock would demand a reduction in price for the built-in gains tax liability of the Corporation's assets at essentially 100 cents on the dollar, regardless of his subjective desires or intentions regarding use or disposition of the assets. Here, that reduction would be 34%. This is true "in

spades" when, for purposes of computing the <u>asset</u>-based value of the Corporation, we assume (as we must) that the willing buyer is purchasing the stock to get the assets,[23] whether in or out of corporate solution. We hold as a matter of law that the built-in gains tax liability of this particular business's assets must be considered as a dollar-for-dollar reduction when calculating the <u>asset</u>-based value of the Corporation, just as, conversely, built-in gains tax liability would have no place in the calculation of the Corporation's <u>earnings</u>-based value.[24]

The Tax Court made a more significant mistake in the way it factored the "likelihood of liquidation" into its methodology, a quintessential mixing of apples and oranges: considering the <u>likelihood</u> of a liquidation sale of assets when calculating the

---

[23] This is easily illustrated by a simplified example: Buyer B wants an assemblage of assets identical to Corporation C's assets. Those assets are worth $1 million on the open market but are depreciated on C's books to a tax basis of $500,000. B has two options: (1) He can buy the assets from C for $1 million and depreciate them to zero over, e.g., seven years (or buy them on the open market and have the same cash flow and tax experience), leaving C to pay its own 34% tax ($170,000) on its gain; or (2) he can buy C's stock, get no depreciation deductions other than, at the corporate level, to the extent the assets are further depreciable, and have a 34% built-in corporate tax liability at sale of the assets. Surely a buyer of the stock rather than the assets would insist on a price reduction to account for the full amount of the built-in gain tax and the loss of the depreciation opportunity.

[24] PRATT ET AL., VALUING A BUSINESS, at 47 ("[T]ax consequences of ownership and/or transfer of stock ... usually are quite different from those of ownership and/or transfer of direct investment in underlying assets. These tax implication often have a significant bearing on value.").

25

asset-based value of the Corporation. Under the factual totality of this case, the hypothetical assumption that the assets will be sold is a foregone conclusion — a given — for purposes of the asset-based test.[25] The process of determining the value of the assets for this facet of the asset-based valuation methodology must start with the basic assumption that all assets will be sold, either by Dunn Equipment to the willing buyer or by the willing buyer of the Decedent's block of stock after he acquires her stock. By definition, the asset-based value of a corporation is grounded in the fair market value of its assets (a figure found by the Tax Court and not contested by the estate), which in turn is determined by applying the venerable willing buyer-willing seller test. By its very definition, this contemplates the consummation of the purchase and sale of the property, i.e., the asset being valued. Otherwise the hypothetical willing parties would be called something other than "buyer" and "seller."

In other words, when one facet of the valuation process requires a sub-determination based on the value of the company's assets, that value must be tested in the same willing buyer/willing seller crucible as is the stock itself, which presupposes that the

---

[25] Id. at 34 ("[I]f valuing a minority ownership interest, one would normally adopt the premise of 'business as usual....'"). Compare id. at 443 ("[T]he asset-based approach tends to be more appropriate when valuing a controlling ownership interest than a noncontrolling ownership interest."). The Decedent's non-supermajority interest is a hybrid, somewhere between minority and full control, so neither approach trumps the other totally.

property being valued is in fact bought and sold.  It is axiomatic that an asset-based valuation starts with the gross market (sales) value of the underlying assets themselves, and, as observed, the Tax Court's finding in that regard is unchallenged on appeal:  When the starting point is the assumption of sale, the "likelihood" is 100%!

This truism is confirmed by its obverse in today's dual, polar-opposite approaches (cash flow; assets).  The fundamental assumption in the income or cash-flow approach is that the assets are <u>retained</u> by the Corporation, i.e., <u>not</u> globally disposed of in liquidation or otherwise.  So, just as the starting point for the asset-based approach in this case is the assumption that the assets are sold, the starting point for the earnings-based approach is that the Corporation's assets are retained — are <u>not</u> sold, (other than as trade-ins for new replacement assets in the ordinary course of business) — and will be used as an integral part of its ongoing business operations.  This duly accounts for the value of assets — unsold — in the active operations of the Corporation as one inextricably intertwined element of the production of income.

Bottom Line:  The likelihood of liquidation has no place in either of the two disparate approaches to valuing this particular operating company.  We hasten to add, however, that the <u>likelihood of liquidation</u> does play a key role in appraising the Decedent's block of stock, and that role is in the determination of the relative <u>weights</u> to be given to those two approaches:  The lesser

27

the <u>likelihood</u> of liquidation (or sale of essentially all assets), the greater the <u>weight</u> (percentage) that must be assigned to the earnings(cash flow)-based approach and, perforce, the lesser the weight to be assigned to the asset-based approach.

Belabored as our point might be, it illustrates the reason why, in conducting its asset-based approach to valuing Dunn Equipment, the Tax Court erred when it grounded its time-use-of-money reduction of the 34% gains tax factor to 5% on the assumption that the corporation's assets would <u>not</u> likely be sold in liquidation. As explained, the likelihood of liquidation is inapposite to the asset-based approach to valuation.

In our recent response to a similarly misguided application of the built-in gains tax factor by the Tax Court, we rejected its treatment as based on "internally inconsistent assumptions."[26] In that case we reversed and remanded with instructions for the Tax Court to reconsider its valuation of the subject corporation's timber property values by using a more straightforward capital gains tax reduction. Similarly, because valuing Dunn Equipment's underlying corporate assets is <u>not</u> the equivalent of valuing the Company's capital stock on the basis of its assets, but is merely one preliminary exercise in that process, the threshold assumption in conducting the asset-based valuation approach as to this company must be that the underlying assets would indeed be sold. And to

---

[26] <u>Estate of Jameson v. Comm'r</u>. 267 F.3d 366, 372 (5th Cir. 2001).

28

whom? To a fully informed, non-compelled, willing buyer. That is always the starting point for a fair market value determination of assets qua assets. That determination becomes the basis for the company's asset-based value, which must include consideration of the tax implications of those assets as owned by that company.

We must reject as legal error, then, the Tax Court's treatment of built-in gains tax liability and hold that — under the court's asset-based approach — determination of the value of Dunn Equipment must include a reduction equal to 34% of the taxable gain inherent in those assets as of the valuation date.[27] Moreover, the factually determined, "real world" likelihood of liquidation is not a factor affecting built-in tax liability when conducting the asset-based approach to valuing Dunn Equipment stock.[28] Rather, the probability of a liquidation's occurring affects only (but significantly) the relative weights to be assigned to each of the two values once they have been determined under the asset-based and

---

[27] We observe a slight discrepancy between the amount of the built-in gain mentioned by the Tax Court in its opinion ($7,109,000) and the gain referred to in the Estate's appellate brief ($7,117,638) to which a 34% tax should be applied. We are satisfied that this minor difference can be resolved by the court and the parties on remand or, alternatively, ignored on the maxim de minimis non curat lex, the net difference to the taxable value of the subject block of stock being roughly $1,200.

[28] The likelihood of liquidation is also taken into account in another way, albeit indirectly and implicitly: in the court's assignment of a 7.5% discount to the Decedent's block of Dunn Equipment stock for lack of supermajority control. For it is liquidation that, absent supermajority, the operational majority stockholder alone cannot force. Thus this discount is grounded in inter alia, the block's inability to make liquidation happen.

income-based approaches, respectively — which brings us to the second methodology issue presented in this appeal.

2. Assignment of Weight to Values

    a. Cash Flow Vis-à-Vis Earnings

Prior to determining the appropriate method of valuing Dunn Equipment, the Tax Court reviewed the factors that bear on the fair market value of a block of stock in a closely-held, non-traded, operating corporation and concluded that

> the value of Dunn Equipment is best represented by a combination of an earnings-based value using capitalization of net cash-flow and an asset-based value using fair market value of assets, with an appropriate discount for a lack of marketability and lack of super-majority control.[29]

In so doing, the Tax Court rejected the approach of the Estate's expert, who used capitalized net earnings to determine the income-based value of the Corporation, and went instead with a capitalized net cash-flow method. As the Estate is not contesting the Tax Court's choice of the cash-flow approach over the earnings approach, we too accept the court's choice.

    b. The Tax Court's Determination of Value

To its credit, the Tax Court flatly rejected the Commissioner's legally and factually absurd contention at trial that no weight should be given to the Corporation's earnings-based value and that its value should be based entirely in an asset-based

---

[29] Dunn, 79 T.C.M. (CCH) at 1339 (emphasis added).

approach, with no consideration of built-in tax liability.  In so doing, the Tax Court concluded that the Commissioner "puts too much emphasis on the fair market value of assets"[30] —— to us, a classic understatement —— and stated correctly that "because Dunn Equipment was an operating company, **the better question is not whether we should disregard the earnings-based value, but whether we should disregard the asset-based value**."[31]  The Tax Court went on to voice agreement with the basic position urged by the Estate's valuation expert that substantial weight should be given to both the asset-based value and the earnings-based value of the Corporation. Although we wholeheartedly endorse the point made by the Tax Court's rhetorical question whether any weight at all should be given to the asset-based value —— and see little hyperbole in it —— we are constrained to proceed, as proposed by the Estate and as done by the Tax Court, with a methodology that assigns some weight to each of the values generated by those two disparate approaches.

The final determination required to complete the pre-discount valuation methodology in this case, then, is the selection of the respective weights (percentages) to be assigned to each of the Corporation's theoretical values, asset-based and earnings-based. As observed in our discussion of the potential effects (or lack thereof) of the likelihood of liquidation and latent gains tax

---

[30] Id.

[31] Id. at 1340 (boldface ours).

liability on the value of the Corporation's <u>assets</u>, it is in the exercise conducted to determine the <u>relative weights</u> to be accorded to each of the two differently calculated values of the Corporation — and only in that exercise — that the <u>likelihood</u> of liquidation vis-à-vis the likelihood of indefinitely retaining and using the assets, comes into play.

The Tax Court was of the opinion — and we agree — that the hypothetical willing buyer of the Decedent's block of stock would be unlikely to provoke liquidation of the company, even if he could. The Tax Court bolstered that conclusion with the recognition that even though the Estate's block of stock represents day-to-day control, the buyer of that block would lack the power to compel liquidation, merger, or consolidation.[32] In this regard, the court cogently emphasized that Dunn Equipment's history, community ties, and relationship with its employees would make it difficult if not virtually impossible for the holder of the Estate's block of stock to secure the votes of additional shares sufficient to institute liquidation. After concluding that the likelihood of liquidation was slight, the Tax Court added:

> A rapid liquidation would have flooded the market with equipment, reducing the value obtained for each piece. A lengthy, drawn-out liquidation (also called a "creeping liquidation") would have risked the loss of customers who, at some point, would have realized that Dunn Equipment no longer meant

---

[32] <u>See</u> TEX. BUS. CORP. ACT ANN. art. 6.03 (Vernon 1991).

> to stay in business and who would therefore have sought other suppliers of equipment.[33]

Despite having asked rhetorically — but, in our opinion, insightfully — whether the asset-based value of the Corporation should not be disregarded altogether, the Tax Court simply reiterated the factors that should be considered (largely paraphrasing Rev. Rul. 59-60), then conclusionally completed its pre-discount valuation methodology by assigning unequal percentages of weight to the results of its two approaches to valuation.

Given the stipulated or agreed facts, the additional facts found by the Tax Court, and the correct determination by that court that the likelihood of liquidation was minimal, our expectation would be that if the court elected to assign unequal weight to the two approaches, it would accord a minority (or even a nominal) weight to the asset-based value of the Corporation, and a majority (or even a super-majority) weight to the net cash flow or earnings-based value. Without explanation, however, the Tax Court baldly — and, to us, astonishingly — did just the opposite, assigning a substantial majority of the weight to the asset-based value. The

---

[33] Dunn, 79 T.C.M. (CCH) at 1340. The Tax Court nevertheless opined that the earnings value of the company appeared to be understated because the earnings projections are based on a low period in a cyclical business. We see this observation as clearly erroneous: Dunn Equipment's business and earnings had been flat for over 10 years — hardly a cycle — and nothing known to the Corporation or any hypothetical buyer as of the valuation date predicted any kind of sustained upturn in the foreseeable future. The Tax Court's belief, grounded in that erroneous analysis of the business cycle, that a hypothetical buyer and seller would give asset value added weight, is likewise clearly erroneous.

court allocated almost two-thirds of the weight (65%) to the results of the asset-based approach and only slightly more than one-third (35%) to the results of the earnings-based approach. We view this as a legal, logical, and economic non sequitur, inconsistent with all findings and expressions of the court leading up to its announcement of this step in its methodology. We also note that the Tax Court's ratio roughly splits the difference between the 50:50 ratio advanced by the Estate and the 100:0 ratio advocated by the Commissioner.

Irrespective of whether the crucial step in the Tax Court's methodology, the assignment of relative weights to the results of the different valuation approaches, is deemed to be an issue of law or a mixed question of fact and law, we review it de novo. Our plenary review leads us inescapably to the conclusion that the Tax Court's 65:35 ratio in favor of its asset-based value constitutes reversible error. How, we must ask, can the value of a corporation that possesses all the attributes verbalized by the Tax Court conceivably be governed essentially twice as much by its asset-based value as by its earnings or cash flow-based value, when its assets (1) are not susceptible of appreciation (except, possibly, de minimis by the condo and the plant sites), (2) are physically depreciated and depreciating as a result of their being used as intended, (3) are being replaced constantly with newer models at great cost, and (4) are virtually certain not to be put up for sale

34

because indefinite operation —— <u>not</u> liquidation —— is all that can be predicted as the Corporation's future, both long-term and short?

At this point we must emphasize the fact that the lion's share of the Corporation's assets comprised heavy equipment which, to such an operating company, is virtually indistinguishable from consumable supplies —— and likely would be so regarded were it not for the administratively necessary but economically unrealistic artificiality of 12-month tax years. Those assets are constantly depreciating from heavy use and obsolescence; they are being replaced to the tune of $2 million annually; their highest and best use is short-term rental, frequently impossible to accomplish without the furnishing of operators by the Corporation; and the tax effects of their unlikely sale to third parties would greatly diminish their value to the Corporation. Indeed, it takes eight salesmen and 123 common-law employees, working full time in this highly competitive industry, to make these heavy-equipment assets produce even moderately acceptable levels of profitability.

Throughout its comprehensive and logical background analysis, the Tax Court recognized that Dunn Equipment is an <u>operating</u> company, a going business concern, the Decedent's shares in which would almost certainly be purchased by a willing buyer for continued operation and not for liquidation or other asset disposition. For purposes of valuation, Dunn Equipment is easily distinguishable from true asset-holding investment companies, which own properties for their own intrinsic, passive yield and

35

appreciation — securities, timberland, mineral royalties, collectibles, and the like. For the Tax Court here to employ a valuation method that, in its penultimate step of crafting a weighting ratio assigns only one-third weight to this operating company's income-based value, defies reason and makes no economic sense.[34] Our conclusion is all the more unavoidable when viewed in the light of the Tax Court's disregard of the ubiquitous factor of dividend paying capacity — in this case, zero — which, if applied under customarily employed weighting methods, would further dilute the weight of the asset-value factor and reduce the overall value of the Corporation as well. The same can be said for the effect on cash flow of the underpayment of officers' compensation.

When we review the objective, factual record in this case — which is all that remained for the Tax Court to rely on after it disregarded most expert testimony — we are left with the definite impression that an error was committed at the weighting step of the method employed here. This review also mandates that something between zero and a small percentage of weight be assigned to the Corporation's asset-based value, and that the remainder of the weight be assigned to its earnings-based value. Under different circumstances, we might be inclined to remand for the Tax Court to make another try at assigning relative weights and constructing a

---

[34] See e.g., B. F. Sturtevant Co. v. Comm'r, 75 F.2d 316, 324 (1st Cir. 1935)(holding that good business judgment must prevail, "and a failure or refusal to exercise that judgment constitutes an error of law").

reasonable ratio. Given the state of the record and the seven-plus years that this case has languished in the courts (over a year now in ours), such a remand, coupled with its potential for yet another appeal, militates against sending this particular issue back to the Tax Court. After all, the record of this case, free as it is of credibility calls and genuine disputes of material fact between the parties (other than as to their experts) places us in exactly the same methodological vantage point as the Tax Court when it comes to assigning relative weights to the results of the valuation approaches employed. This is true regardless of whether that assignment be labeled a question of law or a mixed question of fact and law.

Tempting as it is to follow the implication of the Tax Court's rhetorical question and disregard the asset-based value altogether, we remain cognizant of the venerable Cohan[35] rule, which counsels against assigning a zero value or probability to anything under any circumstances, and therefore resist that temptation. Recognizing the impossibility of ever making an absolutely precise and universally accepted determination of weighting percentages,[36] we

---

[35] Cohan v. Comm'r, 39 F.2d 540, 544 (2d Cir. 1930) (L. Hand, J.) ("But to allow nothing at all appears to us inconsistent....The amount may be trivial and unsatisfactory, but there was a basis for some allowance, and it was wrong to refuse any....").

[36] Fomented in significant part by myriad valuation challenges instituted by the IRS over the past decades, a full-fledged profession of business appraisers, such as the American Society of Appraisers, has emerged, generating its own methodology and lexicon in the process; which in turn have contributed to the profession's

nevertheless hold that the proper method of valuing the stock of Dunn Equipment, under all the relevant circumstances and discrete facts of this case (not the least of which is the "unlikelihood" of liquidation of its assets), requires assigning a weight to its earnings-based value somewhere between 75% and 90%, and to its asset-based value somewhere between 10% and 25%.  Within these ranges we select 85% for the earnings-based weight and 15% for the asset-based weight, producing a 85:15 weighting ratio.

### III. Conclusion

The Tax Court calculated Dunn Equipment's earnings-based value before discount at $1,321,740, and the Estate does not appeal that determination.  Therefore, on remand the Tax Court shall give the

---

respect and mystique.  Because —  absent an actual purchase and sale — valuing businesses, particularly closely held corporations, is not a pure science replete with precise formulae and susceptible of mechanical calculation but depends instead largely on subjective opinions, the writings and public pronouncements (including expert testimony) of these learned practitioners necessarily contain some vagaries, ambiguities, inexactitudes, caveats, and qualifications. It is not surprising therefore that from time to time disagreements of diametric proportion arise among these practitioners.  As the methodology we employ today may well be viewed by some of these professionals as unsophisticated, dogmatic, overly simplistic, or just plain wrong, we consciously assume the risk of incurring such criticism from the business appraisal community.  In particular, we anticipate that some may find fault with (1) our insistence (like that of the Estate's expert) that, in the asset-based approach, the valuing of the Corporation's assets proceed on the assumption that the assets are sold; and (2) our determination that, in this case, the <u>likelihood</u> of liquidation or sale of essentially all assets be factored into the weighting of the results of the two valuation approaches and not be considered as an integral factor in valuing the Corporation under either of those approaches.  In this regard, we observe that on the end of the methodology spectrum opposite <u>oversimplification</u> lies <u>over-engineering</u>.

results of that approach a weight of 85% in computing the Corporation's value. In contrast, the asset-based value, to which a weight of 15% shall be given, must be recalculated by the Tax Court by applying to the previously determined market value of the Corporation's assets, a reduction equal to 34% of those assets' built-in taxable gains. After thus recalculating the Corporation's asset-based value and computing the pre-discount value of the Corporation by application of this 85:15 ratio, the Tax Court shall then reduce the Estate's 62.96% ratable portion of that value by 22.5% for lack of marketability and lack of super-majority control, pursuant to the unappealed discount methodology originally selected by the Tax Court.

With the correct value of the Estate's block of stock in Dunn Equipment thus determined, the court shall recalculate (or the parties shall stipulate) the correct estate tax liability for Decedent's Estate. This will enable the court to enter an appropriate final judgment to account for the Estate's overpayment of taxes as well as interest and any other relevant factors.

Finally, given the Commissioner's delays in issuing his notice of deficiency and his extreme and unjustifiable trial position in advocating a valuation based entirely on asset value (with no reduction for built-in tax liability and no weight given to income-based value), exacerbated by his failure to adduce expert appraisal testimony in support of his own exorbitant proposed value, the Tax Court shall entertain any claim that the Estate might elect to

39

assert under I.R.C. § 7430, if perchance the re-valuation of the Decedent's block of Dunn Equipment's stock should reduce the net worth of the Estate to a sum below the $2 million cap on entitlement to relief under that section.[37]

REVERSED and REMANDED, with instructions.

---

[37] See 28 U.S.C. § 2412(d)(1)(B); I.R.C. § 7430(c)(4)(ii).